**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Clarence Timothy RICHARD, Avery Parker Boyd, Jr., Bruce Carl Henley, and Brian David Russell, Defendants–Appellants.**

Nos. 91–6140, 91–6142, 91–6143 and 91–6146.

United States Court of Appeals,
Tenth Circuit.

June 24, 1992.

M.J. Farber, Asst. U.S. Atty. (Timothy D. Leonard, U.S. Atty., with him on the briefs), Oklahoma City, Okl., for plaintiff-appellee.

Thomas D. McCormick, Oklahoma City, Okl., on the brief for defendant-appellant, Clarence Timothy Richard.

Charles Louis Roberts, El Paso, Tex., for defendants-appellants, Avery Parker Boyd and Brian D. Russell.

Jack D. Fisher, Edmond, Okl., for defendant-appellant, Bruce Henley.

Before ANDERSON, ALDISERT,* and TACHA, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

Clarence Timothy Richard, Avery Parker Boyd, Jr., Bruce Carl Henley, and Brian David Russell ("appellants") appeal their convictions, after a jury trial, for the possession of approximately 300 pounds of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and for conspiring to do the same, in violation of 21 U.S.C. § 846. Because these cases arose from the same transaction and raise common legal issues on appeal, we have consolidated the appeals for purposes of disposition.

Appellants challenge their convictions on three grounds: (1) that the district court erred in refusing to dismiss the indictment because law enforcement lost or destroyed most of the marijuana that appellants allegedly possessed; (2) that the district court violated Fed.R.Evid. 704(b) by impermissibly permitting an expert witness to state an opinion or inference as to the appellants' mental state; and (3) that the evidence at trial was insufficient to support their convictions. Finding no error, we affirm.

## I. FACTS

The charges against appellants arose from a "reverse" drug sting operation mounted by the Oklahoma City Police Department ("OCPD") and conducted by Detective Mark Danner, an officer with the OCPD, Narcotics Unit. In late October and early November of 1990, Danner, posing as a drug supplier, engaged in a series of taped telephone conversations with Larry Guyton, a resident of Blytheville, Arkansas, who wished to purchase 300 pounds of marijuana.

During the conversations, Danner negotiated an agreement to sell Guyton the marijuana, 200 pounds of which was to be sold for cash, and 100 pounds of which was to be sold on credit. Guyton informed Danner that two vehicles, one the "bank," would travel to Oklahoma City to complete the transaction. Guyton also informed Danner that he would not be present but that a colleague, Jimmy Wells, also from Blytheville, would be acting on his behalf.

In preparation for the deal, Danner obtained eight boxes of marijuana with a total weight of approximately 298 pounds from the Oklahoma State Bureau of Investigation ("OSBI") laboratories. He did so pursuant to a written agreement between the OCPD and the Oklahoma State Bureau of Narcotics and Dangerous Drugs. The agreement provided that the OCPD could retain one of the eight boxes used in the operation as well as samples from each of the remaining seven boxes. The seven remaining boxes were to be returned to the OSBI warehouse.

On November 6, 1990, Guyton informed Danner by telephone that the two vehicles, an automobile and an RV, had arrived and were at a Holiday Inn motel in Oklahoma

---

* The Honorable Ruggero J. Aldisert, Senior Judge, United States Court of Appeals, Third Circuit, sitting by designation.

City. Police officers set up surveillance at the Holiday Inn, and Danner traveled there to meet Wells.

After a motel room meeting between Wells and Danner, and after a brief dispute over where the marijuana would be delivered,[1] Wells took Danner to the RV. There, Danner met Colette Bernaugh, who was later confirmed to be the "bank" previously referred to by Guyton. Danner also encountered: Richard, who moved behind him and locked the door as he entered the RV; Russell, who was sitting in the driver's seat, watching him as he entered; and Boyd, who was laying mostly outside of Danner's view on a bed at the back of the RV. The remaining appellant, Henley, was not present during the encounter. All four appellants and Bernaugh, it was later learned, had traveled in the RV to Oklahoma City from St. Louis.

While in the RV, Danner and Bernaugh discussed details of the transaction, and Bernaugh showed Danner a tool box containing several large bundles of cash, later found to be approximately $200,000. Danner then exited the RV and left the Holiday Inn to retrieve the marijuana and make final arrangements for the transaction at the Crosswinds Inn in Oklahoma City. He subsequently returned to the Holiday Inn and had Bernaugh, Wells and appellants follow him in their respective vehicles to the Crosswinds Inn.

Upon arrival, Danner and Wells proceeded to a motel room where Wells was given a sample of the marijuana from one of the boxes. Wells took the sample to the RV. Shortly afterwards, he returned with Bernaugh and the money. As previously arranged, Danner telephoned a fellow officer, Lt. Charles Allen, and directed him to deliver the remaining seven boxes of marijuana to the RV. Danner and Bernaugh then left the motel room and walked to the RV, with Bernaugh carrying the open box, from which the marijuana sample had been provided. When Allen arrived in an undercover vehicle with the rest of the marijuana, Bernaugh began unloading the boxes and placing them in the front of the RV. As Allen then observed, and as appellants themselves testified, Boyd passed the boxes, one by one, to either Richard or Henley, who in turn stacked them in the rear of the RV. Russell held the door to the RV open during the loading process. When all but one of the boxes were loaded, appellants and Bernaugh were arrested. After the arrest, Danner, Allen and other officers entered the RV. Several of the officers later testified that the boxes emitted a strong odor of marijuana.

Following the operation, officers from the OCPD photographed the boxes of marijuana as they stood stacked at the back of the RV, seized the boxes, and returned them to Allen. Allen placed the marijuana in the OCPD Forensic Laboratory. Two days later, on November 8, 1990, Allen took samples from the seven boxes that had remained previously unopened, and officers from the OCPD again photographed the boxes. The box opened during the operation was retained and the seven from which samples had been taken were returned the next day by Danner to the OSBI whose agents stored it in an area where similar narcotics were located and from where the boxes were originally taken. Ultimately, these seven boxes were commingled with approximately twenty-three other boxes of similar size, shape, weight, and markings, in such a way that made it impossible for either Danner or the OSBI to later identify the seven boxes. Further, two OSBI employees testified at a pretrial hearing that the agency had destroyed marijuana in a pit burn after the seven boxes were returned. R. Vol. II at 55, 109. Referring specifically to these boxes, one agent stat-

---

1. Wells informed Danner that he wanted the marijuana to be delivered there. Guyton and Danner had previously arranged for the transaction to take place at the Crosswinds Inn motel in Oklahoma City, and since Danner had already made plans involving the Crosswinds Inn, he objected to that suggestion. Wells left the room and went to the RV, apparently to consider Danner's objection. After returning, and after an intervening phone call with Guyton, who advised Danner and Wells that the transaction would proceed as previously planned, Wells decided to proceed.

ed that "very possibly some of them could have been destroyed." *Id.* at 55.

## II. RICHARD, BOYD, HENLEY, AND RUSSELL

### A. Destruction or Loss of Material Evidence

Appellants first argue that the district court erred in not dismissing their indictment on due process grounds, or otherwise sanctioning the government, for the government's destruction or loss of exculpatory evidence. They claim that the boxes were exculpatory in that they emitted no odor of marijuana. The presence or lack of an odor of marijuana from these boxes was a central issue, as the government sought to use the presence of odor to establish appellants' knowledge as an element of the charged offenses.

■ "Whether destruction [or loss] of evidence by the prosecution amounts to a violation of due process turns on the principles enunciated in *California v. Trombetta,* 467 U.S. 479 [104 S.Ct. 2528, 81 L.Ed.2d 413] (1984), and *Arizona v. Youngblood,* 488 U.S. 51, [109 S.Ct. 333, 102 L.Ed.2d 281] (1988)." *United States v. Donaldson,* 915 F.2d 612, 614 (10th Cir.1990). In *Youngblood,* the Supreme Court distinguished between "potentially useful" evidence and "material exculpatory" evidence. The Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58, 109 S.Ct. at 337. However, when the government fails to disclose material exculpatory evidence to a defendant, the good or bad faith of the government is not relevant. *Id.* at 57, 109 S.Ct. at 337.

■ Here, the district properly determined that the boxes of marijuana provided only "potentially useful" evidence, not "material exculpatory" evidence,[2] and thereafter concluded that appellants had not demonstrated bad faith by any government actor. Order of Jan. 16, 1991, at 4, 8–9.

Since the district court's determination regarding bad faith is a mixed question of fact and law, in which "the quintessentially factual question of intent" predominates, *United States v. McKie,* 951 F.2d 399, 403 (D.C.Cir.1991), we apply the clearly erroneous standard of review. *United States v. Raymer,* 941 F.2d 1031, 1039 n. 4 (10th Cir.1991) (" 'Where the mixed question involves primarily a factual inquiry, the clearly erroneous standard is appropriate.' " (quoting *Supre v. Ricketts,* 792 F.2d 958, 961 (10th Cir.1986))).

■ In an attempt to demonstrate bad faith, appellants contend that the government intentionally destroyed the evidence knowing that this evidence was essential to the appellants' theory of the case. They assert that the police were on notice that the issue of whether the boxes gave off an odor of marijuana would be raised throughout the proceedings. However, appellants failed to proffer any evidence in support of this contention. *See Donaldson,* 915 F.2d at 614. On the other hand, as the district court noted, "the government made an affirmative and credible showing of an absence of bad faith." Order of Jan. 16, 1991, at 8. For example, the government took samples from the seven boxes, it retained the one previously opened box, which was similar to the seven other boxes, once they had been opened to remove samples; and the government photographed the evidence. The mere fact that the government controlled the evidence and

**2.** We find no error in the district court's determination that the boxes of marijuana were at best potentially exculpatory. The court noted:

    At the evidentiary hearing there was no showing that the seven boxes of marijuana, even if available today, would be in the same condition as on November 6, 1990, since the boxes were opened on November 8, 1990, by the OCPD in order to take samples of the contents of each of the boxes. Moreover,

there was no evidence to the effect that the seven boxes of marijuana, even if they had not been opened for sampling purposes, would smell the same in January of 1991 (the trial date) as they smelled in November of 1990. Thus, the boxes at best are only potentially useful to defendants, and this potential is speculative based on the record before the Court.

Order of Jan. 16, 1991, at 4 n. 7.

failed to preserve it is by itself insufficient to establish bad faith. *United States v. Zambrana*, 841 F.2d 1320, 1343 (7th Cir. 1988).

Appellants also contend that the government's handling of the marijuana violated Okla.Stat. tit. 63, § 2–507 and that this constitutes bad faith per se.[3] Appellants do not cite, and we cannot find any authority to support their per se rule. Further, appellants have advanced no persuasive reason or explanation why the showing of an alleged violation of Oklahoma law should serve as a proxy to or sidestep the fact-oriented bad faith analysis under *Youngblood.*

Accordingly, the district court's refusal to find bad faith on the part of the government is not clearly erroneous.

## B. Federal Rule of Evidence 704(b)

Next, appellants argue that the district court improperly admitted portions of Danner's testimony, which they say impermissibly stated an expert opinion or inference as to their mental state in violation of Fed. R.Evid. 704(b).

When asked to give an opinion as to the roles performed by the appellants, Danner testified:

The four other persons who were accompanying Bernaugh from St. Louis which was [sic] Mr. Henley, Mr. Boyd, Mr. Russell, and Mr. Richard, all were helpers of Mr. Bernaugh. It was obvious that he was not going to give them the money to do the transaction or anything of that nature but certainly he's not going to come the number of miles it was and the distance with $200 thousand by himself. He wants some assistance,

some protection just in case anything goes wrong. Therefore, he brought the four defendants. He was a very cautious drug dealer from the start.... No drug dealer of a drug deal this size is going to have four persons that don't know anything about it, have them around without a reason.

Tr. at 150. Further, Danner testified as to the specific tasks performed by appellants, stating:

Mr. Richard and Mr. Henley performed the task of surveillance and loading and assisting in the loading of the marijuana to the back of the RV. Mr. Boyd also assisted in loading of the marijuana from the front part of the RV to Mr. Richard and Mr. Henley. Mr. Russell's task was to hold the door open.

Tr. at 151.

Rule 704(b) states:

No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Appellants argue that by identifying the role each performed, Danner impermissibly stated an *inference* that each appellant knowingly participated in the charged offenses.[4] We disagree.

■ As interpreted, Rule 704(b) only prevents experts from expressly stating the final conclusion or inference as to a defendant's actual mental state. The rule does not prevent the expert from testifying to

---

3. Okla.Stat. tit. 63, § 2–507, Itemization and submission for destruction, states in pertinent part:

Any peace officer of this state seizing any of the property described in subparagraphs 1 and 2 of Section 2–503 [controlled dangerous substances possessed in violation of the Uniform Controlled Dangerous Substances Act] shall cause a written inventory to be made and maintain custody of the same until all legal actions have been exhausted unless such property has been placed in lawful custody of a court or state or federal law enforcement

agency. After all legal actions have been exhausted with respect to such property, the property shall be surrendered ... to the Oklahoma State Bureau of Investigation to be destroyed as provided in Section 2–508.

4. Without discussing the effect of Rule 704(b), this court has previously found this type of expert testimony to be admissible. *See United States v. Pinelli*, 890 F.2d 1461 (10th Cir.1989) (expert identifies the roles of each of the participants in a gambling operation), *cert. denied*, 495 U.S. 960, 110 S.Ct. 2568, 109 L.Ed.2d 750 (1990).

facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state. *E.g., United States v. Dunn*, 846 F.2d 761, 762 (D.C.Cir.1988) ("It is only as to the last step in the inferential process—a conclusion as to the defendant's actual mental state—that Rule 704(b) commands the expert to be silent."); *United States v. Alvarez*, 837 F.2d 1024, 1031 (11th Cir.) ("expert cannot expressly state a conclusion" as to mental state), *cert. denied*, 486 U.S. 1026, 108 S.Ct. 2003, 2004, 100 L.Ed.2d 234, 235 (1988); *United States v. Dotson*, 817 F.2d 1127, 1132 (5th Cir.1987) (testimony may not "directly embrace the ultimate question" of mental state); *United States v. Foster*, 939 F.2d 445, 454 (7th Cir.1991) (testimony "merely assisted the jury in coming to a conclusion as to [defendant's] mental state; it did not make that conclusion for them"). *See also United States v. Dennison*, 937 F.2d 559, 565 (10th Cir.1991) (applying rule to psychiatric expert testimony), *cert. denied,* — U.S. ——, 112 S.Ct. 886, 116 L.Ed.2d 789 (1992).

■ Danner testified that based on his experience, a drug dealer will not invite others to participate in this type of transaction who are not aware of the nature of the transaction. Further, he offered his opinion that appellants performed certain roles typically performed in similar drug transactions.[5] While these remarks may have implied a belief that the appellants were in fact aware of the nature of the transaction,

Danner did not expressly draw that conclusion or inference for the jury. Hence, the testimony was not prohibited by Rule 704(b), and the district court did not err in admitting it. *See, e.g., U.S. v. Theodoropoulos*, 866 F.2d 587, 591 (3d Cir.1989) ("[Expert's] conclusions of the roles played by the defendants in the drug distribution business do not fall within the narrow range of opinions still prohibited under Rule 704."); *United States v. Brown*, 776 F.2d 397, 401 (2d Cir.1985) ("[expert] testimony casting [defendant] in the role of a steerer comes close to, although it is not within" Rule 704(b)), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *Alvarez,* 837 F.2d at 1031 ("The obvious inference of [expert's testimony] is that the defendants in this case were aware of contraband aboard the vessel. Nevertheless, the expert left this inference for the jury to draw. He did not expressly 'state the inference.' Therefore, his testimony did not violate rule 704(b)."). *Compare United States v. Windfelder*, 790 F.2d 576, 582 (7th Cir.1986) (in case of willful evasion of taxes, it was error under Rule 704(b) to admit testimony that defendant "intentionally understated his income" and that "he was well aware of what happened").[6]

## C. Sufficiency of Evidence

Finally, appellants contend that the evidence was insufficient to support the jury's

---

5. The statements that certain appellants assisted in loading and Richard held the door open are simply statements of undisputed fact, not statements of opinion formed through expert analysis.

6. Finally, we note that other language in Rule 704(b) suggests a more fundamental defect in appellants' argument. The rule applies to expert witnesses "testifying with respect to the mental state or condition of a defendant." Rule 704(b). The legislative history suggests that Congress only intended to limit "the scope of expert testimony by psychiatrists and other mental health experts." S.Rep. No. 225, 98th Cong., 2d Sess. 230 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3412. However, no federal circuit court has so held, and in the instant case it is not necessary to determine whether Rule 704(b) should be so confined. *Cf., e.g., United States v. Wilson*, 964 F.2d 807, 810 (8th Cir.1992)

(drug expert); *United States v. Kimble*, No. 91–5111, 1992 WL 79530, at *2, 1992 U.S.App. LEXIS 7652, at *5 (4th Cir. April 21, 1992) (unpublished) [960 F.2d 147 (table) ] (same); *Foster*, 939 F.2d at 454–55 (same); *United States v. Boissoneault*, 926 F.2d 230, 232 (2d Cir.1991) (same); *United States v. Bosch*, 914 F.2d 1239, 1243 (9th Cir.1990) (same); *Theodoropoulos*, 866 F.2d at 590 (same); *Dunn*, 846 F.2d at 762 (same); *Alvarez*, 837 F.2d at 1029–31 (same). *See also United States v. Fowler*, 932 F.2d 306, 315 (4th Cir.1991) (expert on regulations for handling classified information); *United States v. Brodie*, 858 F.2d 492, 496 (9th Cir.1988) (tax expert); *United States v. Angiulo*, 847 F.2d 956, 973–75 (1st Cir.) (mafia expert), *cert. denied*, 488 U.S. 852, 109 S.Ct. 138, 102 L.Ed.2d 110 (1988); *Dotson,* 817 F.2d at 1132 (tax expert); *Windfelder*, 790 F.2d at 582 (tax expert).

guilty verdicts on both counts. We disagree.

"In evaluating a claim of insufficient evidence a court must view all the evidence, direct and circumstantial, as well as all reasonable inferences drawn therefrom, in the light most favorable to the government." *United States v. Levario*, 877 F.2d 1483, 1485 (10th Cir.1989) (citation and footnote omitted). "As an appellate court, we are bound by the rule that the resolution of conflicting evidence and the assessment of the credibility of witnesses is within the sole discretion of the jury as the trier of fact." *United States v. Espinosa*, 771 F.2d 1382, 1391 (10th Cir.) (citations omitted), *cert. denied*, 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985). Further, while the evidence supporting the conviction must be "substantial" and "do more than raise a mere suspicion of guilt," *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir.1987) (quoting *United States v. Ortiz*, 445 F.2d 1100, 1103 (10th Cir.), *cert. denied*, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971)), it "need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. Alonso*, 790 F.2d 1489, 1493 (10th Cir.1986) (quoting *United States v. Henry*, 468 F.2d 892, 894 (10th Cir.1972)). Overall, we must determine whether any reasonable jury could find the defendants guilty beyond a reasonable doubt. *Levario*, 877 F.2d at 1485; *United States v. Hooks*, 780 F.2d 1526, 1532 (10th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986).

To establish the possession offense under 21 U.S.C. § 841(a), the government was required to prove not only that the appellants possessed the marijuana but that they knowingly did so. *Hooks*, 780 F.2d at 1531. To establish the conspiracy offense 21 U.S.C. § 846, the government was required to prove that appellants knew at least the essential objectives of the conspiracy existing between Guyton, Wells, Bernaugh and perhaps others and that the appellants knowingly and voluntarily became a part of it. *United States v. Savaiano*, 843 F.2d 1280, 1294 (10th Cir.1988).

The circumstantial evidence in this case did require some explanation. Appellants set off on an out-of-state trip accompanying Bernaugh, who was carrying $200,000 in cash in order to make a purchase of a large quantity of illegal drugs. Appellants also joined two other people, Wells and a colleague, who were there from a different state exclusively to carry out the transaction. The transaction was executed, after a move from motel to motel, and appellants in fact assisted Bernaugh in loading several boxes of marijuana.

The government's explanation is that appellants had previously agreed to accompany Bernaugh to assist him in the transaction. It is of course true "that evidence of mere presence at the scene of the crime or association with co-defendants is not enough to support a conspiracy conviction." *Espinosa*, 771 F.2d at 1392 (citation omitted). Similarly, "mere proximity to illegal drugs, mere presence on the property where they are located, or mere association with persons who do control them, without more, is insufficient to support a finding of possession." *Id.* at 1397. However, a jury need not ignore presence, proximity and association when presented in conjunction with other evidence of guilt. *Id.* at 1393.

Other evidence adduced at trial supported the government's theory. Danner testified that based on his experience, a drug dealer will not engage in a transaction of this magnitude with helpers that are not aware of the nature of the transaction. Tr. at 150–51. He also testified that appellants carried out roles normally performed in similar drug transactions. *Id.* Further, substantial evidence viewed in the light most favorable to the government supported the conclusion that the boxes of marijuana emitted a strong odor of marijuana, a fact that may have led jurors to believe that appellants, contrary to their testimony, knew the substance they were dealing with. Tr. at 65, 386.

As to three of the appellants, other evidence could have reasonably contributed to the jury's verdicts:

*Richard.* When Danner was first shown the money in the RV, Richard shut and locked the door behind Danner, Tr. at 91, an act that might reasonably make it more probable that Richard was aware of the gravity of the meeting. Richard was also observed peering out of the motel bedroom two or three times at Danner and another undercover agent, as if engaged in surveillance. Tr. at 301. His explanation that he was looking to see if room service was coming was impeached by the government's evidence that no order for room service had been received by the motel. Tr. at 751–53.

*Russell.* When Danner was first shown the money in the RV, Russell was in the front seat and observed Danner enter and converse with Bernaugh. Tr. at 91. Later, as Officer Allen approached to deliver the marijuana, Russell exited the RV and went to meet Allen's undercover vehicle. Allen testified that he made the statement to Russell: "I hope you have somebody to help unload this dope." Tr. at 331, 332. Bernaugh, who was also present when the statement was made, responded: "Yeah, we'll take care of it." *Id.* Russell testified that he simply got out of the RV to stretch, Tr. at 739, and that he did not hear the statement, Tr. at 742.

*Henley.* Henley was seen several times entering and exiting the RV, and he was seen looking around in a way that led undercover agents to believe he was engaged in surveillance. Tr. 285–87. Henley explained that the purposes of these trips were to find a soda, Tr. at 625, rent a room, which was ultimately rented by Wells, Tr. at 627, take a shower, Tr. at 629, and pace while he was waiting to show Richard the rented room, Tr. at 632.

In general, Richard, Henley, and Russell chose essentially identical explanations for their conduct. Each, testifying on his own behalf, claimed he had been invited to party with Bernaugh. Tr. at 575, 619, 689. Boyd, an employee of Bernaugh, testified that he left with Bernaugh the night before the sting with the impression that they were going to Arnold, Missouri, to purchase job-related materials. He awoke the next morning only to find himself in Oklahoma City, a fact which bothered him because that placed him in violation of his parole. Tr. at 495–548. Although traveling through the night, each appellant claimed to remain ignorant of the reason for their arrival in Oklahoma City. Tr. at 557–58, 624–25, 698. Each denied having previously met Wells, and each explained either their absence from or ignorance of the meetings between Wells and Bernaugh in the RV. None claimed to know why they left the Holiday Inn to travel to the Crosswinds Motel. Each denied having prior knowledge of the transaction or smelling the marijuana as it was loaded. Tr. at 502, 575, 680, 693, 709.[7]

The jury could (and obviously did) choose to disbelieve appellants' testimony that they were there merely to "party" or to work. *See Espinosa,* 771 F.2d at 1392. In doing so, it was entitled to consider each defendant's demeanor on the witness stand as evidence of the truthfulness of his tale. We may not disregard the jury's assessment of a witness' veracity. *Levario,* 877 F.2d at 1485 (citing *United States v. Pennon,* 816 F.2d 527, 530 (10th Cir.), *cert. denied,* 484 U.S. 987, 108 S.Ct. 506, 98 L.Ed.2d 504 (1987)). Consequently, taking all the evidence presented at trial as a whole, *see Hooks,* 780 F.2d at 1532 ("In evaluating the sufficiency of the evidence, it is proper for us to consider the collective inferences to be drawn from the evidence as a whole, rather than examining the evidence in bits and pieces."), and in a light most favorable to the jury's verdict, we cannot say that no reasonable jury could find appellants guilty beyond a reasonable doubt, and we therefore find that sufficient

---

7. In light of these explanations, appellants argue that the facts are consistent with both innocence and guilt and that therefore the evidence was insufficient. To the extent this argument resurrects the belief that "a criminal conviction cannot be sustained if a reasonable hypothesis could be designed which is consistent with innocence," the argument has been rejected in this circuit. *Hooks,* 780 F.2d at 1530. Further, this argument ignores the jury's role in evaluating the credibility of the exculpatory theory itself or the defendants' presentation of that theory.

evidence was presented to the jury to support its verdicts.

Accordingly, in case Nos. 91–6140, 91–6142, 91–6143, and 91–6146, the judgment of the district court is AFFIRMED.