**F I L E D**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

CARMELO CALLEJAS,

      Defendant - Appellant.

No. 02-2016
(D.C. No. CR-00-732-BB)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **EBEL**, **PORFILIO**, and **LUCERO**, Circuit Judges.

Defendant-Appellant, Carmelo Callejas, appeals his conviction by a jury of multiple crimes involving the manufacture and sale of crack cocaine, and his sentence of imprisonment for 248 months. The district court increased Callejas's sentence both through the conversion of cash recovered during searches of his residences to a quantity of drugs (a so-called "cash-to-drugs" or "cash-to-crack" conversion as permitted under U.S.S.G. § 2D1.1, comment. 12), and through a finding that he had obstructed justice.

---

[*] This Order and Judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Callejas objects specifically to the sufficiency of the jury's verdict, to the judge's decision to admit certain evidence at trial, to the jury instructions, and to the calculation of his sentence. We find substantial evidence to support the jury's verdict and no error on the part of the district court judge. We therefore **AFFIRM** Callejas's conviction and sentence.

## BACKGROUND

On April 25, 2001, a jury found Callejas guilty on five related drug charges. The first count of his conviction was for maintaining a place for the purpose of manufacturing, distributing, and using controlled substances, including crack cocaine, in violation of 21 U.S.C. § 856 and 18 U.S.C. § 2. The second count was for conspiracy to possess with intent to distribute five grams or more of crack cocaine in violation of 21 U.S.C. § 846. The third count was for manufacturing less than five grams of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), as well as 18 U.S.C. § 2. The fourth count was for possession with intent to distribute less than five grams of crack cocaine in violation of the same statutes as the third count. The fifth count was for possession of firearms in furtherance of a criminal conspiracy in violation of 18 U.S.C. § 924(c).

At trial, the main witness against Callejas was one of his customers in the drug trade, Gilbert Trujillo. On or shortly after September 9, 1999, Trujillo

recognized Callejas in a convenience store in Las Vegas, New Mexico. Callejas offered to sell him crack and powder cocaine that Trujillo believed he manufactured himself. Over the next five days, Trujillo went to Callejas's residence up to ten times per day to buy crack cocaine. At least once during these drug purchases, Trujillo noticed that Callejas had a 9mm handgun. On September 14, 1999, however, Trujillo arrived at Callejas's house to discover police executing a search warrant against Callejas and was arrested. During the execution of this search warrant, police found ingredients and tools for manufacturing crack cocaine, a .45 caliber handgun, a box of .38 caliber ammunition, $750 in cash on Callejas's person, and $4,990 in cash in the glove compartment of his car. State prosecutors brought charges against Callejas after that search, but dismissed the charges and released Callejas in favor of building a federal case against him instead.

On February 9, 2000, an undercover narcotics agent attempted a controlled "buy" of crack cocaine from Callejas. Wearing a wire, he negotiated the purchase of a $500 "rock" from Callejas. Callejas wore a .38 caliber semiautomatic handgun during the exchange.

Callejas, though, insisted that the agent smoke drugs in front of him before he would complete the transaction. The agent declined and, in a tense confrontation, Callejas told him to leave. As the agent turned to leave, Callejas's

associate lifted up the back of the agent's shirt to reveal the body wire. The agent backed away from the scene with his hand on his gun and drove away.

Continued surveillance of Callejas's residence in March 2000 revealed additional traffic patterns typical of drug sales. For example, in a two-hour span on March 25, 2000, police observed ten individual people enter Callejas's apartment, each departing within five minutes of their arrival. In a forty-minute span on April 3, 2000, four different people went into Callejas's residence, each leaving within two minutes. The next day, in a two-hour span, police observed thirteen different people enter Callejas's apartment, all but one of whom left again within two minutes of arrival.

During the execution of a second search warrant on April 5, 2000, Callejas was warned shortly before the arrival of the police by his girlfriend, who kept watch on the front porch. When officers broke down the door, one of Callejas's associates was found manufacturing crack cocaine in the kitchen sink. Officers found Callejas crouched in the bathroom, having just flushed something down the toilet. Collected in this second search of the house was the crack cocaine Callejas's associate had been manufacturing, further instruments for manufacturing drugs, a loaded 9mm handgun, extra ammunition for the gun, a loaded .38 caliber semiautomatic handgun, $5,010 in cash divided into small bundles tucked into the wall under the bathroom sink in the room where officers

found Callejas, $452.74 in cash on Callejas's person, and $2,020 in cash divided into small bundles in Callejas's car.

After the introduction of the items seized, a police officer, Lieutenant Romero, testified at trial for the limited purpose of discussing the drug trade in the Las Vegas, New Mexico area, the types of instruments that are commonly used to manufacture drugs, the types of weapons usually found on people who manufacture drugs, and other patterns that sometimes mark drug dealers. Callejas offered alternative jury instructions on the meaning of possession, but the district court employed pattern jury instructions instead. The jury returned a verdict finding him guilty after slightly more than two hours of deliberation.

At his sentencing on December 6, 2001, Callejas took the stand to object to the Presentence Report's (PSR) recommended enhancement of his sentence by conversion of cash to drugs on the ground that the cash seized had not been his. The total amount of cash recovered in the two searches had been $12,020, but the PSR reduced the amount of cash to be considered in the cash-to-drugs conversion by $1,000 to avoid double-counting the proceeds of drugs sold to Trujillo in Callejas's total. The remaining $11,200 in proceeds from drug sales were converted to a weight of 560 "rocks" or 56 grams given the street value of $20 a rock. Adding this figure to the amount of actual cocaine recovered in buys and searches, Callejas sentence was based on a level of 65.6 grams.

In his objection at the sentencing hearing that the cash had not been his, Callejas did not explain who else might have stowed the cash on his person, in his car, or in his bathroom. He had, for example, the only key to the glove box of the car in which the cash had been found, and his name had been on the utility bill of the residence in which officers found cash on April 5. Defense counsel vaguely mentioned that other persons such as Callejas's girlfriend and the associate who had been cooking cocaine during the search had access to the house where the cash had been stored in the bathroom, but provided no details to support an assertion that the money found in the room with Callejas had been theirs.

Callejas also argued, in a contradictory objection, that all of the cash seized was his but came from a legitimate clothing resale business importing goods from Chinatown in New York City to Las Vegas, New Mexico.

On cross-examination, Callejas had to admit that no re-sellable clothing had been found in either of the two searches of his residence. He, however, denied point-blank that he had been involved in the manufacture of crack cocaine when caught by the police on April 5, 2000, and denied that he had been flushing product down the toilet when the police arrived moments after he had been warned. On the stand, under oath, Callejas additionally denied that he knew the main witness against him, to whom the jury found that he had sold crack cocaine,

and denied that he, in a bizarre twist proven in police records, had gone to police in the area for protection and to turn in other drug dealers.

The district court found both that the PSR's cash-to-drugs conversion was appropriate and that Callejas had been lying on the stand. See, e.g., Sentencing Tr. at 12 ("[Y]our client just took the stand and willfully lied in an attempt to avoid the consequences of his prior acts."). It further commented that

> [o]ne of the benefits of going to trial is that the defendant has the opportunity to convince the Court of the weakness of the Government's case and his own veracity. The other side of that coin is that the defendant can impress upon the Court his guilt and his lack of veracity. That's what's happened in this case. I have to say, I've rarely seen a defendant who I thought was so committed to a criminal way of life. Even when he was found out and the wire [on the undercover agent] disclosed, he continued to manufacture and sell crack cocaine.

Id. at 24.

Defense counsel, in a last minute objection, attempted to argue that the court could not find that Callejas had perjured himself because his false testimony related solely to the calculation of his sentence, rather than to matters material to the trial or the circumstances of Callejas's conviction. The district court dismissed these attempted distinctions. First, Callejas had perjured himself both at his trial and at his sentencing. The single substantive comment Callejas had made at trial was that he had moved from New York to New Mexico in June 1999. Trujillo, however, had testified at trial that he had known Callejas from

New Mexico before June 1999, so Callejas had pitted his credibility directly against the other man's, and Trujillo was found to be more credible. At the sentencing hearing, the district court found that Callejas had again knowingly lied under oath on the date that he arrived in New Mexico. Second, Callejas's perjury at the sentencing hearing itself related to both the circumstances of his conviction as well as to the calculation of his sentence. Callejas had lied at the sentencing hearing about receiving his income from a clothing resale business – a question which went both to his guilt or innocence of the drug charges, as well as to the source of the bundles of cash.

Finally, the district court imposed the PSR's recommended cash-to-drugs conversion, enhanced Callejas's by two points for obstruction of justice, and committed Callejas to a total of 248 months' imprisonment.

On appeal, Callejas makes six arguments for reversal and/or for a new trial. First, he argues that the evidence at trial was not sufficient for a reasonable jury to have found him guilty. Second, he argues that the district court abused its discretion in permitting Lieutenant Romero to testify as to the potential significance of certain physical items recovered during searches of his residences. Third, he argues that the district court erred in declining to give his proffered jury instruction on joint possession. Fourth, he argues that the district court committed clear error in increasing his sentence through the "cash-to-drugs"

conversion.  Fifth, he argues that the district court abused its discretion in increasing his sentence for obstruction of justice.  Sixth, even if none of these issues rises to the level of reversible error, their cumulative effect should require reversal.

We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and conclude that none of these arguments on appeal has merit.  We **AFFIRM** Callejas's conviction and sentence.

### DISCUSSION

I.    Sufficiency of the Evidence

We review a jury's verdict for sufficiency of the evidence <u>de novo</u>.  <u>United States v. Lewis</u>, 240 F.3d 866, 870 (10th Cir. 2001).  In this review, however, we interpret all evidence in the light most favorable to the government before asking whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt.  <u>United States v. Hanzlicek</u>, 187 F.3d 1228, 1239 (10th Cir. 1999).

As viewed in the light most favorable to the government, the evidence in the case establishes that a reasonable jury could have found Callejas guilty beyond a reasonable doubt.  On Counts I, III, and IV, the evidence establishes that Callejas manufactured and sold crack cocaine from his residences, and was essentially caught red-handed doing so: he was attempting to flush the material

down the toilet when the police found him. On Count II, Callejas received assistance in his drug dealing from other conspirators including from the man who was manufacturing crack cocaine at the sink when the police walked in, from his girlfriend who was the look-out and warned Callejas that the police were arriving, and from at least one other man who assaulted the undercover agent on Callejas's behalf when he attempted to buy crack from him. On Count V, Callejas carried weapons and kept firearms at the ready in his places of business to assist him in the conduct of his drug dealing. During the undercover agent's attempt to buy drugs from Callejas, he saw Callejas wearing his .38 caliber handgun; during the searches of his residences, the police found a .45 caliber handgun, a 9mm handgun, ammunition for that gun, and the ammunition for Callejas's .38.

On the basis of the plentiful evidence presented at trial, a reasonable jury could have found that Callejas was guilty of the charges against him beyond a reasonable doubt.

## II.    Police Officer's Testimony

We review a district court's ruling on evidence for abuse of discretion. See United States v. Hernandez-Herrera, 952 F.2d 342, 343 (10th Cir. 1991). A decision constitutes an abuse of discretion only if it is "arbitrary, capricious, whimsical, or manifestly unreasonable." Id.

Under Federal Rule of Evidence 704(b) "No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a defense thereto.  Such ultimate issues are matters for the trier of fact alone."  As we have written, however, Rule 704(b) does not prevent an expert from testifying to facts or opinions from which a jury could conclude or infer that a defendant had the requisite mental state to be guilty of the crime charged. United States v. Richard, 969 F.2d 849, 854 - 55 (10th Cir. 1992) (citing United States v. Dunn, 846 F.2d 761, 762 (D.C. Cir. 1988) ("It is only as to the last step in the inferential process — a conclusion as to the defendant's actual mental state — that Rule 704(b) commands the expert to be silent."); United States v. Foster, 939 F.2d 445, 454 (7th Cir. 1991) (holding that testimony "merely assisted the jury in coming to a conclusion as to [defendant's] mental state; it did not make that conclusion for [the jury]")).

Callejas asserts that Lieutenant Romero effectively testified as to his state of mind and purpose in possessing the drug manufacturing instruments and firearms.  The district court was careful, however, to restrict the officer's testimony to very limited subjects.  The officer was not permitted, for example, to discuss a drug dealer's purpose in having a gun, which the prosecution argued

was for protection of his product. The court explicitly found that the officer would not have had an adequate foundation, based only on anecdotal evidence and the comments of drug dealers whom he had arrested, to suggest what Callejas's particular motivation might have been in carrying a gun.

At the district court's order, the officer thus steered far clear of pronouncing any ultimate opinion on Callejas's mental state or any element of a crime. On direct examination, the officer carefully restricted his testimony to those subjects permitted by the district court. Accordingly, as required by Rule 704(b), the jury alone properly drew its own ultimate conclusions about Callejas's state of mind and the purpose of his conduct in possessing the weapons discovered during the searches of his residences.

We find that the district court carefully limited Lieutenant Romero's testimony and did not abuse its discretion in permitting him to testify as to the potential significance of items recovered during the searches of Callejas's residences.

## III. Jury Instructions on Joint Possession

We review de novo whether, "as a whole, the instructions [actually given] correctly state the governing law and provide the jury with an ample

understanding of the issue and applicable standards." United States v. Basham, 268 F.3d 1199, 1206 (10th Cir. 2001).

The jury instructions in Callejas's trial tracked the Fifth Circuit's Pattern Jury Instruction 1.31 on possession. They read:

> Possession, as that term is used in this case, may be of two kinds: actual possession and constructive possession. A person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it.
>
> A person who, although not in actual possession, knowingly has both the power and the intention, at a given time, to exercise dominion or control over a thing, either directly or though another person or persons, is then in constructive possession of it.
>
> Possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.
>
> You may find that the element of possession, as that term is used in these instructions, is present if you find beyond a reasonable doubt that the defendant had actual or constructive possession, either alone or jointly with others.

Evaluating these instructions on possession as a whole as we must under Basham, they state the governing law and provide the jury with an ample understanding of the issue and applicable standards. Basham, 268 F.3d at 1206. Nothing on the face of the instructions indicates that the district court erred in charging the jury in this manner. Callejas makes no argument that their statement

- 13 -

of the law is incorrect nor does he attempt to establish how the instructions might have confused the jury in any way.

Accordingly, we find Callejas's objection to the district court's jury instructions to be without merit.

IV.    The "Cash-to-Drugs" Conversion

We review a district court's determination of the quantity of drugs attributable to a defendant for clear error. United States v. Rios, 22 F.3d 1024, 1028 (10th Cir. 1994). Clear error is present only when the reviewing court is left with the "definite and firm conviction that a mistake has been committed." United States v. Verduzco-Martinez, 186 F.3d 1208, 1211 (10th Cir. 1999). The district court's finding need merely be permissible in light of the evidence. Id.

In United States v. Rios, 22 F.3d 1024 (10th Cir. 1994), we held that there was an adequate connection between the defendant and the money found in an apartment to support a cash-to-drugs conversion. Id. at 1028. We found "ample circumstantial evidence showing that [the defendant's] money came from drug transactions in which the defendant at least participated, if not was solely responsible for," id. at 1026, despite the fact that several other people had regular access to the area in which the money was discovered including a woman who had

- 14 -

participated in the defendant's drug sales, and at least one or more of her teenage children. Id.

In Rios, we established that cash-to-drugs conversions were appropriate where a preponderance of the evidence established that the cash attributable to uncharged drug activities resulted from the "same course of conduct" or "common scheme or plan" as the conviction. Id. at 1028. The factors we employed to determine whether the uncharged drug activities were part of the "same course of conduct" as the conviction were their similarity, regularity, and temporal proximity to the conviction. Id. The factors to determine whether the uncharged drug activities were part of a "common scheme or plan" as the conviction are the common identity of participants and their similar roles in activities. Id.

Callejas admits that the district court had authority for the "cash-to-drugs" conversion in sentencing, but argues that its determination was not supported by sufficient evidence to connect him to the money found. Callejas proffers no argument why we should find clear error in the district court's presumption that he owned the cash found on his person and in the glove box of the car to which he had the only key. We need not then consider this argument on appeal. American Airlines v. Christensen, 967 F.2d 410, 415 n.8 (10th Cir. 1992) (holding that it is insufficient appellate argument to state that a trial court erred without advancing a reasoned argument for reconsideration on appeal). Defense counsel argued,

- 15 -

however, that the $5,010 in cash found in Callejas's bathroom on April 5, 2000 might not have been Callejas's because other individuals had access to it. We apply the Rios test to the $5,010 in cash found in Callejas's bathroom, and conclude that the district court did not clearly err in its enhancement of Callejas's sentence by conversion of this cash to drugs.

Under the first part of our Rios test alone, the $5,010 in cash in the wall of Callejas's bathroom can be presumed to be proceeds from the "same course of conduct" as his conviction because it was found in his immediate surroundings during one of the drug raids upon which his conviction was based. Officers found the $5,010 in cash during the execution of the search warrant, divided into bundles and tucked into the wall under the sink of the bathroom in which Callejas was hiding from police and flushing material down the toilet. Moreover, other people in the house with Callejas were engaged in drug-related activities at the time. Indeed, the man standing at the kitchen sink when the police arrived had been cooking cocaine, a large quantity of which was recovered. A further search revealed the instruments to manufacture crack cocaine, another $452.74 in cash on Callejas's person, and $2,020 in cash in his car. Thus the circumstances in which the $5,010 in cash in the bathroom was found strongly indicate that they were the proceeds of drug sales.

Finally, not related to the <u>Rios</u> test, but pertinent to the district court's finding that the money came from drugs rather than from a legitimate source, the district court specifically found Callejas's assertion that the money came from a clothing resale business to be a lie. Its finding was buttressed by evidence from at least one other witness who testified that Callejas apparently had no legitimate job.

Accordingly, we find that it was not clear error for the district court to have followed the recommendation of the PSR and to have converted the cash found near Callejas during the drug raids into an equivalent quantity of drugs.

V. <u>Obstruction of Justice</u>

We review a district court's imposition of an adjustment for obstruction of justice for clear error. See <u>United States v. Burridge</u>, 191 F.3d 1297, 1301 (10th Cir. 1999).

Under U.S.S.G. § 3C1.1, a district court may make a two-point upward adjustment to its sentence if a defendant "willfully obstruct[s] or impede[s], or attempt[s] to obstruct or impede, the administration of justice during the course of investigation, prosecution, or sentencing of [his] offense." Perjury qualifies as a type of obstruction of justice. U.S.S.G. § 3C1.1 comment n. 4(b); <u>United States v. Dunnigan</u>, 507 U.S. 87, 96 - 98 (1993).

- 17 -

Although a defendant has a constitutional right to testify in his own defense, he has no right to commit perjury. Dunnigan, 507 U.S. at 96; Harris v. New York, 401 U.S. 222, 225 (1971). Perjury occurs when a witness "(1) . . . testifying under oath, gives false testimony; (2) concerning a material matter; (3) with willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Massey, 48 F.3d 1560, 1573 (10th Cir.), cert. denied, 515 U.S. 1167 (1995).

Callejas obliquely suggests that his testimony was not shown to be false. However, his primary argument is that the statements to the court were not material to his conviction and sentence. A matter is material for the purposes of perjury if "believed, would tend to influence or affect the issue under determination," U.S.S.G. § 3C1.1 comment. n.6, or could "substantially affect the outcome of the case." United States v. Hilliard, 31 F.3d 1509, 1518 - 19 (10th Cir. 1994) (quoting United States v. Parker, 25 F.3d 442, 448 (7th Cir. 1994) and Dunnigan, 507 U.S. at 95 - 96)).

In making a finding of perjury, a sentencing court must specifically identify those portions of a defendant's testimony it finds false. United States v. Hawthorne, 316 F.3d 1140, 1146 (10th Cir. 2003) ("[A]lthough [the Supreme Court has] . . . not require[d] sentencing judges specifically to identify the perjurious statement, it has long been a requirement in the Tenth Circuit that the

perjurious statement be identified, at least in substance.") (quoting Massey, 48 F.3d at 1573). The district court, however, need not recite the perjured testimony verbatim. United States v. Medina-Estrada, 81 F.3d 981, 987 (10th Cir. 1996). Rather, "[a] district court [need only] generally identify the testimony at issue . . . so that when we review the transcript we can evaluate the . . . finding[] . . . of perjury . . . without having simply to speculate on what the district court might have believed was the perjurious testimony." Massey, 48 F.3d at 1574; accord United States v. Mounkes, 204 F.3d 1024, 1029 (10th Cir. 2000). We may easily identify the testimony that the district court believed was perjurious in this case, and hold that the district court did not clearly err in finding it to be material and false.

The district court found that Callejas had lied on at least two occasions: once at trial and again at the sentencing hearing. Callejas knowingly lied under oath at trial about the date that he arrived in New Mexico. He lied again at the sentencing hearing about receiving his income from a clothing resale business. Both of these lies went to issues relevant to Callejas's conviction and sentencing. If the jury had believed his testimony about when he arrived in New Mexico, it might have been persuaded that Callejas was too new to the area to have criminal contacts or to oversee a developed criminal enterprise. And if the court had believed that Callejas operated a legitimate business, he might have received a

lower sentence because the court might have concluded that the cash seized was from that business and not the proceeds of drug sales.

The district court also had a wealth of information in the record to support its conclusion that Callejas's statements constituted perjury. First, at least one other witness testified that Callejas had no apparent legitimate job. Second, Callejas admitted on cross-examination that no re-sellable clothing had been found in either of the two searches of his residence, whereas, of course, plenty of drugs had been. Third, the pattern of traffic to his house as observed and documented by the police was consistent solely with the sale of drugs, not with the sale of clothing. In short windows of time, the police observed nearly thirty people going to Callejas's residence, the majority of whom left within two minutes of when they arrived. There was also no evidence that they transported containers of clothes, as would be necessary if engaged in a clothing resale business.

Accordingly, we find that it was not error for the district court to have increased Callejas's sentence for obstruction of justice in light of his perjured testimony.

VI.    Cumulative Error

We review allegations of cumulative error under the harmless error standard.  United States v. McKneely, 69 F.3d 1067, 1080 (10th Cir. 1995).  Cumulative error aggregates whatever harmless error may have occurred, and analyzes whether its cumulative impact affected the defendant's substantial rights.  United States v. Fuentez, 231 F.3d 700, 709 (10th Cir. 2000).

We find that there can be no cumulative error analysis in this case because the district court committed no error.  McKneely, 69 F.3d at 1080; see also, e.g., Moore v. Reynolds, 153 F.3d 1086, 1113 (10th Cir. 1998) ("Cumulative error analysis applies where there are two or more actual errors.").  Callejas's conviction and sentence should not, therefore, be reversed on the basis of cumulative error.

## CONCLUSION

We find that there was sufficient evidence presented at trial for a reasonable jury to have found Callejas guilty, and the district court did not err in its decisions presiding over the trial or in its sentencing procedure.  Callejas's conviction and sentence are **AFFIRMED**.

ENTERED FOR THE COURT


David M. Ebel
Circuit Judge

- 21 -