UNITED STATES of America,
Plaintiff–Appellee,

v.

George L. BOHL, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard R. BELL, Defendant–Appellant.

Nos. 91–5180, 91–5181.

United States Court of Appeals,
Tenth Circuit.

May 20, 1994.

John E. Dowdell of Norman & Wohlgemuth, Tulsa, OK, for defendant-appellant George L. Bohl.

James C. Lang of Sneed, Lang, Adams & Barnett, Tulsa, OK (G. Steven Stidham, with him on the brief), for defendant-appellant Richard R. Bell.

Neal B. Kirkpatrick, Asst. U.S. Atty. (Susan K. Morgan, Asst. U.S. Atty., with him on the brief), U.S. Atty., Tulsa, OK, for plaintiff-appellee.

Before SEYMOUR, Chief Judge, EBEL, Circuit Judge, and McWILLIAMS, Senior Circuit Judge.

EBEL, Circuit Judge.

In this appeal, we must consider whether the government violated the Due Process Clause of the Fifth Amendment by depriving the Defendants–Appellants, Richard R. Bell ("Bell") and George L. Bohl ("Bohl"), of pretrial access to potentially exculpatory evidence in violation of the standards set out in *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). We conclude that the government denied Bell and Bohl a meaningful opportunity to present a defense by intentionally disposing of potentially exculpatory and highly probative evidence in the face of Bell and Bohl's repeated requests for pretrial access to that evidence. Accordingly, we reverse.[1]

## I.

The conviction of Bell and Bohl arose from their performance of a contract to build ra-

---

1. Although these appeals were not consolidated, we consider them jointly in this opinion because the dispositive issues are identical.

Additionally, we grant the government's uncontested motion to supplement the record on appeal with original trial exhibits.

dar and radio transmission towers for the Federal Aviation Administration ("FAA"). Bell and Bohl serve as President and Vice-President, respectively, of Transmission Structures, Ltd. ("TSL"), an Oklahoma corporation. On June 30, 1986, the FAA awarded TSL Contract DTFA–02–86–D–86568 ("Contract") to design and fabricate numerous guyed and self-supporting radar and radio transmission towers.

Pursuant to a post-award amendment to the Contract, TSL agreed to construct the legs of the guyed towers using 50,000 pounds per square inch ("ksi") yield strength steel that "conform[s]" to American Society for Testing Material ("ASTM") A–618, an accepted industry standard for the chemical composition of a certain kind of steel. For the self-supporting towers, the parties did not alter the original Contract specification requiring the use of 36,000 ksi yield strength steel consistent with ASTM standards A–53 or A–501. After inspecting TSL's physical plant and approving the company's tower design plans, the FAA ordered seventy-two towers from TSL during 1987 and 1988. TSL had fabricated sixty towers for the FAA when this action commenced.

Ultimately, the FAA concluded that TSL was using nonconforming steel in the fabrication of the towers, and the government's ensuing criminal charges focused on three towers that allegedly contained carbon and manganese levels exceeding A–618 and A–501 standards: two self-supporting towers (one installed in Bangor, Maine and the other in Boise, Idaho) and one guyed tower erected in Luthersville, Georgia.

The FAA initially grew wary of the steel composition of one TSL tower in October, 1988, when a leg on the Bangor tower fractured. Although TSL replaced the deficient leg, an FAA contract officer requested University of Maine Arnold Greene Testing Laboratory scientists to analyze samples from the fractured leg. The University's test report revealed excess levels of carbon and manganese in the sampled steel. The government returned to TSL the portion of the Bangor tower leg from which the sample was

extracted, which the parties estimated at oral argument to have been approximately eighteen inches in length. Subsequent to receiving this finding and reports about apparent inadequacies of other TSL towers, the FAA requested the inspection of every tower that TSL completed under the Contract. It also ordered TSL to cease fabrication of all additional towers called for under the Contract. FAA officials met with Bell and Bohl on November 21, 1988 to discuss the status of the Contract. At this time, TSL commenced an internal review to determine whether its steel suppliers failed to deliver to it the proper grade steel.

In direct response to the FAA's challenge to the quality of the steel—and in the hope of renewing its fabrication of towers under the Contract—TSL repeatedly and explicitly requested access to the allegedly nonconforming towers to conduct its own inspection of the steel.[2] According to an uncontroverted affidavit filed by Bell, a specific request for access to and preservation of the towers was made to the FAA officials during the November 21, 1988 meeting. Bell additionally testified that he and Bohl conducted "numerous telephone conversations" with FAA officials between October 1988 and April 1989, during which Bell and Bohl demanded access to the allegedly nonconforming steel towers. In a letter dated July 13, 1989, Bell informed the FAA Contracting Officer that "TSL is particularly anxious to receive information from the FAA as to the current activities or disposition related to any of the towers we have manufactured," and the "fact that you have not answered questions concerning rumored irresponsible disposal of towers, causes us great concern." The government does not dispute that these requests were made, and it concedes that the FAA failed to respond to TSL's requests for access to the towers.

In January 1989, the FAA awarded Raytheon Corporation a contract to test the towers' chemical composition. In addition, the FAA awarded a contract in March 1989 for the removal and disposal of every TSL tower—including the Bangor, Boise, and Luthersville towers that provided the evidentia-

---

**2.** The record indicates that because TSL's contract with FAA required delivery of the towers "F.O.B. Vinita, Oklahoma," TSL did not know where the FAA had installed the towers.

ry basis for Bell and Bohl's convictions. Unbeknown to Bell and Bohl, but affirmed by the testimony of Jerry Martin, a special agent in the United States Department of Transportation ("DOT") Inspector General's Office, the DOT commenced a criminal investigation of Bell and Bohl's conduct in May 1989.

Knowing that the FAA had awarded a contract for the removal of the towers, Agent Martin requested FAA officials to "preserv[e] evidence before the towers are scrapped[,] ... particularly ... the towers that were not tested for chemical composition." He said the government needed to complete its investigation "to preclude loss of Government rights for remedy through either civil or criminal action." In a letter dated August 30, 1989, the DOT Inspector General's Office requested the FAA to refer any TSL communications to the office of the United States Attorney for the Northern District of Oklahoma. Despite this cooperation between the DOT Inspector General's Office and the FAA regarding the criminal investigation, and the government's recognition of the importance of the towers for purposes of developing its chemical tests as evidence against TSL or its officers, TSL's requests for access to, and the preservation of, the towers remained unanswered.

On September 6, 1990, a grand jury in the Northern District of Oklahoma charged Bell and Bohl with conspiracy to defraud the United States in violation of 18 U.S.C. § 286 (Count 1); three counts of submitting false claims for payment from the United States and aiding and abetting in violation of 18 U.S.C. §§ 287, 2(b) (Counts 2–4); and six counts of mail fraud in violation of 18 U.S.C. § 1341 (Counts 5–10). In testimony before the grand jury on September 6, 1990, DOT Special Agent Martin testified that the TSL towers were being razed "as we speak."

In the wake of this indictment, Bell and Bohl renewed their request for access to and preservation of the towers. In a letter dated September 24, 1990 to Assistant United States Attorney Neal B. Kirkpatrick, Bohl's counsel wrote:

I would additionally appreciate the provision of information relating to all towers which are the subject of specific counts in the Indictment. Specifically, I would like i. to obtain copies of any tests conducted on any of these towers ... ii. to know the location (at this time) of the towers which are the subject of the Indictment; and iii. to have access to these towers.

As before, this request went unanswered. Accordingly, Bohl's counsel sent an additional letter on October 2, 1990, in which he explained that "[i]n view of the currently scheduled pretrial hearing (October 5) and the trial date (October 15), it is critical that the defendants be given access to the towers as soon as possible."

The government finally responded in a letter dated October 18, 1990, in which Assistant United States Attorney Kirkpatrick pledged to Bohl's counsel that "as soon as possible we [will] let you know the present condition and location of the towers." Instead, however, the only actual tower material the government ever provided to Bell and Bohl was the eighteen-inch portion of one leg from the Bangor tower and shavings extracted from legs on the Boise and Luthersville towers.

Arguing that this scant evidence precluded them from conducting their own tests on the towers' chemical composition, Bell and Bohl filed a pretrial motion to dismiss the indictment on November 5, 1990, due to the government's destruction, sale, and loss of essential evidence. The court convened a pretrial hearing on November 16, 1990, during which the government conceded that it failed to respond to repeated requests for information on the whereabouts of the towers and that the actual towers could not be located. The government said, however, that Bell and Bohl had access to comparable evidence in that the government provided them with photographs of the towers, small samples, and the government's test results. The court rejected Bell and Bohl's motion to dismiss.

At trial, Bell and Bohl renewed their argument by filing a motion for judgment of acquittal pursuant to F.R.Crim.P. 29, on the grounds that the government's destruction of the towers deprived them of the opportunity to conduct their own examination of the tow-

ers' chemical composition. The court did not grant the motion, concluding that, because the government's destruction of the towers "is going to be part of [Bell and Bohl's] defense in the case ... we just ought to wait and cross the bridge when we get there."

When Bell and Bohl renewed their motion for judgment of acquittal at a subsequent point in the trial, the court denied it on the grounds that no evidence demonstrated that "there was any intent on the part of the government to cause these towers to be destroyed."

On April 15, 1991, a petit jury of the District Court for the Northern District of Oklahoma returned a verdict of not guilty for both Bell and Bohl on the conspiracy count (Count 1). However, the jury convicted Bell and Bohl on the fraud, aiding and abetting, and mail fraud counts (Counts 2–10).

The linchpin of the government's case was that Bell and Bohl committed fraud during TSL's performance of the FAA contract by fabricating the Bangor, Boise, and Luthersville towers with steel pipe of inferior grade and type than that which the Contract specified. At trial, and over Bohl's objections, the government offered its laboratory test results to demonstrate that the carbon and manganese composition of these three towers failed to comply with the Contract specifications. Bell and Bohl unsuccessfully maintained that the steel used in the towers complied with the contract and that the government's test results were suspect.

On November 1, 1991, the district court denied Bell and Bohl's post-trial motion for judgment of acquittal, or, in the alternative, for a new trial. The court concluded that, consistent with its earlier rulings, the government neither withheld exculpatory evidence from Bell and Bohl nor destroyed "proper evidence." Bell and Bohl unsuccessfully filed an identical motion on November

6, 1991 due to alleged newly discovered evidence, which was denied.[3] Thereafter, the court sentenced Bell on November 14, 1991 to twenty-one months imprisonment and ordered him to pay restitution to the FAA in the amount of $420,007.05. The court issued an identical sentence to Bohl on November 18, 1991.

In this appeal, Bell and Bohl allege three errors: (1) prior to the trial, the government destroyed the allegedly nonconforming steel transmission towers, thereby depriving Bell and Bohl access to the towers to prepare their defense; (2) the evidence was insufficient to sustain the convictions; and (3) false testimony was delivered to the grand jury.[4]

## II.

■ We use the clearly erroneous standard to review the district court's conclusion that the government did not destroy potentially exculpatory evidence. *United States v. Richard,* 969 F.2d 849, 853 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 248, 121 L.Ed.2d 181 (1992). The inquiry into allegations of prosecutorial bad faith presents a mixed question of fact and law in which "the quintessential factual question of intent" predominates. *Id.* (quoting *United States v. McKie,* 951 F.2d 399, 403 (D.C.Cir.1991). *See also, Supre v. Ricketts,* 792 F.2d 958, 961 (10th Cir.1986) (clearly erroneous standard applies when factual issues predominate in situations where there is a mixed question of fact and law).

■ The principles articulated in *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), regarding the Due Process Clause and the government's destruction or loss of evidence prior to a criminal trial guide our analysis.[5] Under the two-prong *Trombetta* test, the government vio-

---

3. The alleged newly discovered evidence included government test results, on towers other than the Bangor, Boise, and Luthersville towers, showing that some of TSL's towers complied with the Contract specifications.

4. Because of our ruling on the first issue, we need not address the other two issues raised in this appeal.

5. The Due Process Clause of the Fifth Amendment states that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V.

lates a defendant's right to due process when: (1) it destroys evidence whose exculpatory significance is "apparent before" destruction; and (2) the defendant remains unable to "obtain comparable evidence by other reasonably available means." *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534. The Court in *Youngblood* extended *Trombetta* to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was "potentially useful" for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence. *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337–38.

We have applied the principles of *Trombetta* and *Youngblood* in three recent cases. In *Richard,* we rejected the appellant's allegation that the government destroyed evidence in bad faith because the appellant failed to proffer any evidence that the government knew the appellant wanted certain boxes containing marijuana preserved for trial. Further, the government presented affirmative evidence explaining its actions and establishing its good faith in preserving what it believed was the relevant evidence. The court observed that the "mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith." *Richard,* 969 F.2d at 853–54. In *United States v. Sullivan,* 919 F.2d 1403, 1427–28 (10th Cir.1990), *cert. denied,* —— U.S. ——, 113 S.Ct. 285, 121 L.Ed.2d 211 (1992), we remanded to determine the exculpatory value of the destroyed evidence and to determine whether the government destroyed the evidence in bad faith. Finally, in *United States v. Donaldson,* 915 F.2d 612, 614 (10th Cir.1990), we held that *Trombetta* and *Youngblood* also apply to sentencing proceedings, but that the appellant failed to produce any evidence demonstrating bad faith.

■ We first must determine whether *Trombetta* or *Youngblood* governs our analysis of Bell and Bohl's due process challenge. This inquiry turns on the import of the destroyed materials. To invoke *Trombetta,* a defendant must demonstrate that the government destroyed evidence possessing an "apparent" exculpatory value. *Trombetta,* 467

U.S. at 489, 104 S.Ct. at 2534. However, to trigger the *Youngblood* test, all that need be shown is that the government destroyed "potentially useful evidence." *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337. The Court in *Youngblood* defined "potentially useful evidence" as evidence of which "no more can be said than that it could have been subjected to tests, the results of which *might* have exonerated the defendant." *Id.* at 57, 109 S.Ct. at 337 (emphasis added). Because our review of the record concludes that the tower legs offered only potentially useful evidence for Bell and Bohl's defense, we apply the rule of *Youngblood* rather than *Trombetta.*

The *Trombetta* standard of "apparent" exculpatory evidence has not been met here because, on the record before us, the government's test results suggest that the towers' chemical composition failed to conform to the Contract specifications. *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534. Even Bell and Bohl seem to agree that the exculpatory value of the legs lay only in the potential results that might be obtained from further tests—tests that they could not perform because the towers were destroyed. Hence, the exculpatory value was latent, rather than patent, and it was not apparent at the time of the destruction of the legs what further tests on the legs would reveal. Accordingly, Bell and Bohl fail to meet the first prong of *Trombetta.*

■ Turning, then, to the first prong of the *Youngblood* test, we must determine whether the steel constituted potentially exculpatory evidence. Here, Bell and Bohl presented substantial evidence that, if they had the actual tower legs, there was a reasonable possibility that further tests might have produced material exonerating evidence. At trial, Bell and Bohl's expert metallurgist testified that accurate testing could not be conducted on the shavings that the government provided to them, due to the limited quantity of the samples; that the government's testing procedure may have contaminated the shavings themselves; and that the government's testing procedures failed to comply with accepted industry standards and may have led to an inaccurate finding of the carbon and manganese levels

in the towers. In addition, a purchasing agent for TSL testified that he purchased certified steel for the towers that would have satisfied the Contract specifications. Furthermore, government contracting agents testified that the towers had appeared to meet the Contract specifications when they inspected the steel at the time the towers were fabricated.

Given the substantial dispute over testing methodologies to determine the chemical composition of the steel tower legs, doubts about the accuracy of the government's tests, and Bell and Bohl's additional independent evidence of the possibility that the steel met the Contract specifications, Bell and Bohl have established that the actual steel used in the towers was potentially useful for their defense because their own tests of the steel might have exonerated them.[6]

■ Pursuant to the second prong of *Youngblood*, we next consider whether the government acted in bad faith when it disposed of the allegedly nonconforming towers manufactured by TSL. Our inquiry into bad faith "must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 57 n. *, 109 S.Ct. at 336 n. *.

In evaluating the good or bad faith of the government when it disposed of this evidence, we note first that the government was explicitly placed on notice that Bell and Bohl believed the tower legs were potentially exculpatory. Bell and Bohl repeatedly sent letters to, and met with, the FAA to request access to the allegedly nonconforming towers. Also, just after the grand jury issued the indictment in September 1990, counsel for Bohl sent two letters to Assistant United States Attorney Kirkpatrick, renewing the request for access to and preservation of the towers. *Compare Richard*, 969 F.2d at 853 (noting that the appellant failed to proffer any evidence to show that the police were on notice about the potential exculpatory value of the evidence before it was destroyed).

Second, Bell and Bohl's assertion that the tower legs possessed potentially exculpatory value was not merely conclusory, but instead was backed up with objective, independent evidence giving the government reason to believe that further tests on the leg might lead to exculpatory evidence. *Cf. United States v. Martinez*, 744 F.2d 76, 79–80 (10th Cir.1984) (holding that a clerical police error resulting in the destruction of evidence did not rise to the level of a *Trombetta* violation when the defendant's contention that the lost evidence contained exculpatory value was "based purely on speculation and conjecture"). Here, FAA Quality Reliability Officers ("QROs"), appointed to ensure that TSL's towers complied with the Contract specifications, conducted on-site inspections of TSL's manufacturing facilities while the towers were under fabrication but not yet galvanized. The QROs also collected samples of welds and issued inspection and material reports generated from their evaluation of TSL's material certifications for the towers. The QROs inspected the tower legs and never rejected any of them. Additionally, Bell and Bohl proffered a certificate received from one of TSL's steel suppliers, a copy of which was sent to the FAA on March 2, 1987, stating that the steel purchased by TSL, so-called J–55 steel, conformed in chemical composition to A–618 steel. A FAA Quality Reliability Officer received this certificate in connection with TSL's performance of the Contract.

The facts in the Ninth Circuit's *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir.1993), are instructive. In *Cooper*, the government destroyed the defendants' chemical laboratory equipment in bad faith because it knew that the equipment could be useful for the defendant's case. At issue was whether chemical laboratory equipment seized by Drug Enforcement Agency agents possessed the physical capacity to manufacture methamphetamine. The defendants maintained that their equipment was used instead to manufacture naval jelly and dex-

---

**6.** Indeed, the government's test results of the Bangor tower appear to show significant fluctuations among the samples tested, and some of the samples appeared to have met most or all of the Contract specifications. This may reveal inconsistent quality of the steel, but it may also suggest inconsistency in the accuracy of the government's tests.

tran sulfate, and that the equipment would not withstand the high temperatures required to manufacture methamphetamine. One defendant's parole office, and the landlord of the building in which the laboratory was situated, had informed the government agents that the equipment was devoted to lawful chemical processes and lacked the capability to produce methamphetamine. Despite having gained this knowledge from independent sources, the government destroyed the laboratory equipment, thereby depriving the defendants of the opportunity to present a defense. Such destruction, in the face of corroborative evidence of the potentially exculpatory nature of the evidence from sources other than the defendants themselves, constituted bad faith. *Id.* at 931.

The third factor we deem significant to our inquiry into bad faith is that the record reveals that the government still had possession or the ability to control the disposition of the tower legs at the time it received notice from Bell and Bohl about the tower legs' potential exculpatory value. *See United States v. Sherlock*, 962 F.2d 1349, 1355 (9th Cir.1989) (rejecting allegation of bad faith destruction of evidence, in part, because neither the government nor its agent had possession or control of the evidence at the time it disappeared), *cert. denied sub nom. Charley v. United States*, —— U.S. ——, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992). Here, DOT Special Agent Martin testified before the grand jury on September 6, 1990 that TSL towers were being razed "as we speak"—well after Bell sent the letter of July 13, 1989 to the FAA, met with FAA representatives, and engaged in numerous telephone conversations with them to request access to and preservation of the towers. At oral argument, the government acknowledged that there was no testimony at trial, and nothing in the record, refuting Agent Martin's testimony about when the towers were razed, while actual destruction undoubtedly occurred even later because the government conducted its own tests on these towers. Because we must accept Agent Martin's uncontested testimony, we conclude that the government had not destroyed the towers by the time Bell and Bohl requested access to them.

■ Fourth, the evidence disposed of here was central to the government's case. As with the laboratory equipment in *Cooper*, nothing was more probative on the issue of the steel composition of TSL's towers than the towers themselves. Indeed, the government's case against Bell and Bohl turned almost entirely on the steel composition of the towers and the government's test results were the crown jewels of its case-in-chief. To rebut the government's test results, Bell and Bohl could only present a general denial of the allegations and seek to undermine the credibility of the government's chemical analyses of the allegedly nonconforming steel. This was an inadequate substitute for defense testimony informed by Bell and Bohl's own inspection and testing of the towers. The failure to preserve evidence that is obviously critical to the prosecution weighs in favor of an accused's *Youngblood* claim.

■ Fifth, the government offers no innocent explanation for its failure to preserve the steel which formed the core of its criminal case against Bell and Bohl. Of course, mere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith. *Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337–38; *see also Montgomery v. Greer*, 956 F.2d 677, 680–81 (7th Cir.) (due process not violated when police negligently lost photographs used to identify defendant), *cert. denied*, —— U.S. ——, 113 S.Ct. 460, 121 L.Ed.2d 368 (1992); *United States v. Sanders*, 954 F.2d 227, 231 (4th Cir.1992) (accidental erasure of video evidence does not constitute bad faith destruction); *United States v. McKie*, 951 F.2d 399, 403 (D.C.Cir.1991) (bad faith not demonstrated when the defendant can show nothing more than that the government lost physical evidence and thereby deprived the defendant of an opportunity to refute a Drug Enforcement Agency lab report as to the quantity and chemical composition of seized cocaine).

Moreover, courts have held that the government does not necessarily engage in bad faith conduct when the destruction of evidence results from a standard procedure em-

ployed by the governmental department or agency regarding the disposal of like evidence, at least when there is adequate documentation of the destroyed evidence. *United States v. Gibson,* 963 F.2d 708, 711 (5th Cir.1992) (United States Border Patrol agents "routinely" destroy seized controlled substances sixty days after informing the United States Attorney about the seizure, pursuant to agency procedure); *United States v. Belden,* 957 F.2d 671, 673–73 (9th Cir.) (cutting of marijuana plants pursuant to routine practice due to lack of storage capacity does not rise to the level of bad faith), *cert. denied,* —— U.S. ——, 113 S.Ct. 234, 121 L.Ed.2d 169 (1992).

What this authority teaches is that even if the government destroys or facilitates the disposition of evidence knowing of its potentially exculpatory value, there might exist innocent explanations for the government's conduct that are reasonable under the circumstances to negate any inference of bad faith. Although the defendant has the burden of proving the bad faith of the government in destroying the evidence, *Donaldson,* 915 F.2d at 614, we note that the government here offers no reasonable rationale or good faith explanation for the destruction of the evidence. The government does not contend that the towers were destroyed inadvertently or negligently, or pursuant to standard procedure, before it knew of their potential exculpatory nature.

■ Thus, on the record before us, all we have is the government deliberately disposing of steel whose chemical composition was the central issue in the criminal trial. The disposition occurred in the face of the defendants' repeated requests for preservation of

such evidence so that they could conduct their own tests. Further, at the time the government disposed of such evidence, it had received substantial independent evidence suggesting that its tests of the steel might have been flawed and that the steel might, in fact, have conformed to the Contract specifications. This evidence, in the absence of any innocent explanation offered by the government, gives rise to a logical conclusion of bad faith.[7]

In response, the government only states that Bell and Bohl had evidence comparable to the actual towers in the form of photographs of the towers, the minimal samples, and the government's test results. However, these evidentiary items do not satisfy *Youngblood.*

First, the government's argument that photographs suffice to satisfy *Youngblood* is sharply undermined by the following statement in the government's brief to this court: "the *only* way to positively determine chemical composition [of the tower legs] is through testing." (emphasis in original) Indeed, DOT Special Agent Martin testified before the grand jury that the "only way ... to independently verify that the material going into the legs of these towers was in accordance with contract specifications" was to test the towers themselves.[8]

Nor does the record support the government's contention that the minimal samples it turned over to Bell and Bohl were adequate. The government provided Bell and Bohl with only an approximately eighteen-inch portion of the Bangor tower and shavings from the Boise and Luthersville towers. At trial, Bell and Bohl offered uncontested expert testimo-

---

7. The government contends that our decision in *Richard,* in which a claim of bad faith destruction of evidence was rejected, is "almost on all fours" with the instant case. We disagree. In *Richard,* the government destroyed boxes containing marijuana without knowing that the issue of whether the boxes emitted an odor of marijuana would be offered as a defense. *Richard,* 969 F.2d at 853. In the absence of knowledge that the boxes would be critical for the defense of a lack of odor, we held that the government did not destroy the boxes in bad faith. *Id.* Whereas the defendants in *Richard* failed to offer proof that the government possessed such knowledge prior to the destruction of evidence, the Appel-

lants in the instant case have demonstrated that the government knew that the allegedly nonconforming towers were essential for the defense.

8. In addition, although the government argues on appeal that the photographs demonstrate that the steel utilized in the allegedly nonconforming towers was used, the government fails to provide any citations to the record that part of the charge against Bell and Bohl was that they did not manufacture the towers with new pipe. To the contrary, the government explains that the contract solicitation authorized the use, under limited circumstances, of used material.

ny from a metallurgist that this portion of the Bangor tower was too small, according to industry standards, to conduct a reliable examination of the chemical composition of the steel. Not only did the government fail to offer any contrary expert testimony about the alleged inadequacy of the sample size, but it also restricted the portion of the eighteen inch section from which Bell and Bohl could extract a sample to conduct their own tests. With respect to the Boise and Luthersville towers, the government concedes that it provided shavings amounting only to approximately 50 grams per tower. This record, then, establishes as uncontroverted that portions of the Bangor leg and the Boise and Luthersville shavings provided to Bell and Bohl were inadequate samples from which they could examine the chemical composition of the steel.

Lastly, in light of the significant dispute over the government's testing methodologies to determine the chemical composition of the steel in TSL's towers, we conclude that the government's test results also did not constitute evidence comparable to the actual towers.

Our final task is to determine the appropriate remedy. The Court in *Trombetta* explained that "when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing ... the State's most probative evidence." *Trombetta,* 467 U.S. at 487, 104 S.Ct. at 2533. *See also United States v. Fletcher,* 801 F.2d 1222, 1225 n. 3 (10th Cir.1986) (remanding for a hearing on whether the government violated *Trombetta* and, if so, whether the proper remedy would be to suppress evidence derived from the lost or destroyed material or to dismiss the indictment).

■■■ Unlike cases in which the prosecutor fails to disclose *Brady* material, where a court may order a new trial at which the undisclosed evidence can be introduced, the disposition of evidence that is central to the case may permanently deprive the defendant of due process. Accordingly, after concluding that there has been a violation of *Youngblood,* the decision to either suppress the government's secondary evidence describing the destroyed material or to dismiss the indictment turns on the prejudice that resulted to the defendant at trial. *Cf. United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 3381–82, 87 L.Ed.2d 481 (1985) (when the government violates a defendant's due process rights under *Brady,* a court must determine whether the suppressed evidence would "undermine confidence[ ] in the outcome of the trial"); *United States v. Abello–Silva,* 948 F.2d 1168, 1179 (10th Cir.1991) (same), *cert. denied,* — U.S. —, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992). Such factors as the centrality of the evidence at trial, the reliability of the secondary evidence, and the effect such destruction had on the defendant's ability to present a defense, must be considered in the calculus. *See Cooper,* 983 F.2d at 933 (affirming district court's decision to dismiss the indictment, rather than merely suppress the government's evidence).

■■■ We conclude that the proper remedy in the instant case is dismissal of the indictment against Bell and Bohl. Inasmuch as the chemical composition of the steel in TSL's towers was critical to the government's case, Bell and Bohl offered credible evidence both that their own tests might have produced exculpatory evidence and that the government's testing methodology was flawed, and the government does not suggest an alternative to protect Bell and Bohl's due process rights, we have no choice but to remand with instructions to dismiss the indictment.

### III.

Accordingly, we REVERSE and REMAND with instructions to dismiss the indictment.