FILED
United States Court of Appeals
Tenth Circuit

February 4, 2011

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

ROBERT GUTIERREZ,

     Defendant - Appellant.

No. 09-2277

(D. N.M.)
(D.C. No. 1:07-CR-02428-JCH-1)

**ORDER AND JUDGMENT**[*]

Before **O'BRIEN**, **SEYMOUR**, and **EBEL**, Circuit Judges.

Robert Gutierrez appeals from the district court's denial of his motion to dismiss

the charge against him — felon in possession of a firearm — due to the government's

destruction of evidence. Arrested after he drove into a cinder block wall while fleeing

police, Gutierrez contends the destruction of the videotape of the traffic stop, the

mishandling of a firearm at the scene and the destruction of the damaged car required

---

[*]Oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). We have decided this case on the briefs.

This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id*.

dismissal of the charge. The district court denied his motion for two reasons — he failed to show the evidence had apparent exculpatory significance prior to its destruction and he did not establish bad faith on the part of the government. We affirm.[1]

## BACKGROUND

At approximately 2:30 a.m. on February 18, 2007, Officer Joshua Anderson of the Bernalillo, New Mexico, Police Department was on patrol. As he drove by a house known to the police from past encounters, he observed an unfamiliar 1995 Chevrolet Beretta parked in the driveway. While he continued to patrol the neighborhood, he called dispatch for a license plate check and discovered the plates were not registered to that particular vehicle. As he drove past the house again, he saw the car leaving the driveway. He turned on his overhead lights to initiate a traffic stop. The car pulled to the side of the road and stopped. As Anderson got out of his patrol car, the Beretta sped away. Anderson pursued it. As Anderson turned a corner, he saw the car had crashed into a cinder block wall. The driver was approximately five to ten feet from the car, attempting to escape on foot. Anderson pulled to a stop behind the Beretta and continued the chase on foot. Eventually, he subdued the driver with a taser. As Anderson handcuffed the suspect, he recognized him as Gutierrez based on prior "dealings." (R. Vol. 3 at 29.)

Anderson placed Gutierrez in the back seat of the patrol car and started taking photographs of the scene with a digital camera. While doing so, he noticed a gun lying on the ground a few feet from the front driver's side of the car. It was later identified as a

----

[1]Our jurisdiction derives from 28 U.S.C. § 1291.

.45 caliber Hi-Point pistol. After taking approximately six photographs of the scene, Anderson lifted the gun by the trigger guard and placed it on top of the patrol car. Sergeant Nixon, another officer with the Bernalillo police force, then arrived at the scene. He told Anderson the officer who originally had been sent as "back . . . up" was involved in a serious single vehicle crash on his way to the scene. (*Id*. at 56.) After ensuring Anderson was unhurt, Nixon left "and went to the other officer's aid." (*Id*. at 57.) Anderson then waited for a Sandoval County Sheriff's deputy. When he arrived, the deputy took control of the gun and, upon a safety check, removed a .45 caliber hollow point cartridge from the chamber. Anderson could not recall whether the sheriff's deputy wore gloves as he handled the weapon but conceded the manner in which it was de-armed would probably smear any fingerprints.

Anderson returned to the police station with Gutierrez, who was charged with aggravated fleeing, a fourth degree felony.[2] Gutierrez complained of pain in his lower back where the Taser had made physical contact. He was sent to the hospital for observation and released[3] at approximately 5 a.m.

When the patrol car's overhead lights were activated prior to the traffic stop, the action triggered a videotape camera to begin recording. The videotape continued to record until after Gutierrez was arrested. After Anderson placed the gun into evidence, he and Sergeant Nixon reviewed the videotape to determine whether Anderson had

---

[2] Later, an additional state charge of felon in possession of a weapon was added.

[3] Gutierrez expressed surprise that he was released rather than held, which had been the case in prior arrests.

complied with pursuit protocol, *i.e.*, he was not driving recklessly. Anderson testified the tape quality was grainy and dark. It showed Gutierrez for a moment after the crash as he ran out of the frame. The videotape, however, was not placed into evidence with the gun. Instead, like other used videotapes, it was placed in a secure area for ninety days. Because Gutierrez made no request for the tape within ninety days, it, like all others, was recycled.

The Sandoval County Sheriff's office handled the crash investigation. After a cursory inventory, the car was towed from the scene to a lot owned by a towing service. Anderson secured the vehicle with evidence tape. A few days later, after receiving a search warrant, Anderson searched the car for evidence. Under the driver's seat, he discovered a magazine for the .45 caliber pistol loaded with six cartridges. The magazine was placed into evidence with the gun. The car was then cleared to be released to the owner. It remained in the tow yard for ninety days but the registered owner, Gloria Madrid, a friend of Gutierrez's mother, failed to claim it. It was then sent to a scrap yard and, thirty days later, destroyed.

Because Gutierrez was a convicted felon, federal agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) conducted further investigation beginning in October 2007, several months after the events of February 18. This investigation led to another arrest of Gutierrez, on December 14, 2007, for felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and

924(a)(2).[4]  Gutierrez moved for dismissal of the federal charges due to the destruction of what he claimed to be probative and potentially exculpatory evidence.  His theory of defense was lack of knowing possession — he was unaware of the firearm in the car.  He proposed the pistol must have been hidden, by others, under the driver's seat with the magazine and was forcefully ejected from the car upon impact with the cinder block wall.  He argued the videotape would have shown the crash into the wall and him leaving the car without a gun in his hand, thus corroborating his defense.  He also claimed the mishandling of the firearm prevented his ability to have it tested for fingerprints of third parties.  Finally, he contended the destruction of the car precluded access to its "black box[]" which records various vehicular data and preserves it in a cache for eight seconds.  The cached data would, he claims, would have contained the vehicular data for up to eight seconds prior to a severe impact (R. Vol. 1 at 11.)  and that data would have allowed him to present scientific evidence to demonstrate the gun could have been ejected from the car on impact.  He attributes bad faith to law enforcement officers because they "were going to try [to] put me away for as long as they could" and he had been the "subject of police attention, if not harassment, for a considerable period of time."  (R. Vol. 1 at 30; Vol. 3 at 161.)

At the hearing on Gutierrez' motion Carlos Herrera (the defense investigator), Officer Anderson, Agent Jessen (the ATF investigating officer), Gutierrez and Gutierrez's wife, Shannon, testified.  After listening to the testimony, the district court

---

[4]The state charges against Gutierrez were dismissed on December 17, 2008, due to the pending federal charges.

decided Gutierrez had failed to show the evidence was apparently exculpatory before it was destroyed or that the officers acted in bad faith. Shortly after the court's ruling, Gutierrez entered a conditional guilty plea, preserving his right to appeal from the denial of his motion to dismiss, and was sentenced to ten years imprisonment.

## DISCUSSION

Review of the denial of a motion to dismiss accepts the district court's factual findings unless clearly erroneous and the evidence is considered in the light most favorable to the government. *United States v. Bennett*, 329 F.3d 769, 773 (10th Cir. 2003). The district court's conclusion that the government did not destroy potentially exculpatory evidence is reviewed for clear error. *United States v. Bohl*, 25 F.3d 904, 909 (10th Cir. 1994). "The inquiry into allegations of prosecutorial bad faith present[] a mixed question of fact and law in which the quintessential factual question of intent predominates." *Id.* (quotations omitted).

The Due Process Clause imposes a duty on the government to preserve evidence but "that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984). The government violates a defendant's due process rights when it destroys evidence that: (1) "possess[es] an exculpatory value that was apparent before [it] was destroyed"; and (2) is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489; *see also Bohl*, 25 F.3d at 909. In *Arizona v. Youngblood*, the Court refined *Trombetta,* -- where the government fails "to preserve evidentiary material of which no more can be said than that it could have been subjected

to tests, the results of which might have exonerated the defendant," no due process violation occurs unless the defendant demonstrates the government acted in bad faith. 488 U.S. 51, 57-58 (1988); *see also Bohl*, 25 F.3d at 910. Under *Youngblood*, a due process violation based on the government's failure to preserve evidence requires the defendant to establish: (1) the evidence was "potentially useful"; and (2) the government acted in bad faith. *Youngblood*, 488 U.S. at 58. Gutierrez's due process rights were not violated under *Trombetta* or *Youngblood*.

The district court considered the destroyed items to have had no "apparent" exculpatory value at the time they were destroyed. (R. Vol. 3 at 220.) We agree. Gutierrez argues the videotape had apparent exculpatory value because it "captured the entire chase, Mr. Gutierrez crashing into the wall, and . . . getting out of his vehicle." (Appellant's Reply Br. at 7.) This statement, however, is not supported by the record. Anderson testified:

Q. [The videotape camera] was operating that night, wasn't it?

A. Yes, sir, it was.

Q. And at some point, the chase ended?

A. Yes.

Q. And how did it end?

A. It ended by the vehicle crashing into a cinderblock wall.

Q. And you were behind the vehicle when that happened?

A. No, sir. I was actually coming around the corner when the vehicle hit the cinderblock wall. The subject had already exited the vehicle when I actually got in behind it.

. . . .

Q. Well, you saw the subject exit the vehicle, didn't you?

A. No, I didn't. He was already out of the vehicle when I came to a stop.

. . . .

A. The camera would have had the same view that I had, yes, sir.

(R. Vol. 3 at 51-52, 54.) Although not a model of clarity, the most reasonable interpretation of this testimony is that Anderson did not see the crash or Gutierrez's exit from the car. Apparently, Anderson's first view was of Gutierrez running away. Accordingly, it is unlikely the videotape captured any exculpatory evidence.

Gutierrez also questions the credibility of the testimony regarding the poor quality of the tape. He argues: "[I]f the videotape was clear enough to make certain that no policies were broken, then [it] would have been clear enough to establish if Mr. Gutierrez had a weapon." (Appellant's Reply Br. at 6.) The argument is not only conclusory, but counterintuitive. Reckless driving would more likely be evident on a poor quality tape than the absence of a gun from the hand of a fleeing suspect, particularly when the observation was merely fleeting. In any event, relative video clarity would depend upon myriad factors none of which are evident from this record. We afford considerable deference to the trial judge in weighing the evidence and drawing conclusions from it; this spare record does not serve Gutierrez's arguments. Gutierrez also points to testimony from Anderson and Jessen conceding it would have been better practice to preserve the videotape. While probably true, such testimony does not establish apparent *exculpatory* value.

Finally, Gutierrez claims the videotape could have been enhanced had it not been destroyed. At most, this argument establishes that if the videotape was available, further testing may have produced exculpatory evidence. This is insufficient to warrant application of *Trombetta*. *See United States v. Parker*, 72 F.3d 1444, 1451 (10th Cir. 1995) ("The mere possibility that lost or destroyed evidence could have exculpated a defendant is not sufficient to satisfy *Trombetta's* requirement that the exculpatory value be apparent to the police before destruction.") (quotations omitted). The "black box"[5] from the Chevrolet and the alleged mishandling of the .45 caliber pistol are subject to the same flaw. Neither item was "exculpatory" without further testing. Thus, we need not address the second prong of *Trombetta*. *See Bohl*, 25 F.3d at 910.

Turning to the *Youngblood* criteria, while the destroyed evidence may have been "potentially useful," there is no evidence of bad faith by the officers. "Our inquiry into bad faith must necessarily turn on the [police officer's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Bohl*, 25 F.3d at 911 (quotations omitted). We may consider whether: (1) the government was on notice that the defendant believed the evidence to be potentially exculpatory; (2) the defendant's assertion (to the government) of its potential exculpatory value was merely conclusory or

---

[5]Gutierrez's reference to a "black box" is a loose reference to a computer attached to an airbag system in some passenger vehicles. Some systems have an added feature that allows data storage known as an "Event Data Recorder" (EDR). *See* http://www.crashforensics.com/automobiledatarecorders.cfm [last visited December 1, 2010]. "Different EDR's have different capabilities in what they store." (*Id.*) GM models as old as 1994 have an EDR function but the "number of older GM models with this EDR function is low." (*Id.*) Gutierrez produced no evidence demonstrating (or even suggesting) this particular vehicle was equipped with a functioning EDR system.

supported by objective, independent evidence; (3) the government still had possession of or the ability to control the disposition of the evidence at the time it received notice from the defendant of the evidence's potential exculpatory value; (4) the destroyed evidence was central to the government's case, (5) the government offers an innocent explanation for its failure to preserve the evidence; and (6) the destruction of the evidence was in accordance with standard procedure and the evidence was adequately documented prior to its destruction. *Id*. at 911-13.

Most of these factors weigh in favor of the government in this case. The federal investigation did not begin until after the evidence was destroyed. However, the videotape was available for ninety days before it was recycled. The vehicle, in the control of the sheriff's department, was impounded for ninety days before it was sent to be scrapped. The gun was not mishandled by Anderson, but, for safety reasons, was emptied by a deputy from the sheriff's department and sometime later tested by federal agents.[6] Gutierrez does not claim his defense lawyer timely sought to obtain the evidence he now insists was apparently exculpatory. Neither does he argue the videotape was central to the government's case. There is no evidence that the handling of these items was contrary to established procedures in effect at the time of the arrest.[7] Finally, failure

---

[6]Gutierrez argues the deputy unloaded the pistol "without gloves, destroying any fingerprints that could have been on the weapon." (Appellant's Reply Br. at 11.) Again, this misstates the record. Anderson testified he did not recall if the officer wore gloves. Nevertheless, it is clear that the handling of the gun by the deputy would probably have obscured any otherwise usable prints**.**

[7]Gutierrez claims the destruction of *all* the exculpatory evidence demonstrates bad faith. But as discussed, the evidence was not obviously exculpatory, the destruction was

to use best practices in preserving evidence is not sufficient, by itself, to establish bad faith.

Indeed, the only evidence of bad faith, other than the unavailability of the evidence itself (a marginally relevant fact), is Gutierrez's testimony that he generally felt targeted by the Bernalillo police and his wife's recollection that, on one occasion, she was unfairly subjected to a traffic stop so that the police could talk to her husband. It is hardly surprising Gutierrez had drawn the attention of the local police department given his criminal record. To the extent police interest in a criminal suspect would suggest bad faith, the test would be objective – whether the police were unjustifiably interested in him.[8] His subject impression is irrelevant. In any event, even accepting his convenient and subjective notion of bad faith, the evidence here is not sufficient to tip the scales in his favor or demonstrate clear error by the district court in concluding the officers had not acted in bad faith.

Finally, Gutierrez suggests we need not find bad faith. He argues we need only find negligence because the evidence was destroyed before the federal charges were commenced and his counsel did not have a chance to preserve Gutierrez's rights. We recently declined to reach a similar argument in *Hood*, wherein we recognized that "Justice Stevens objected to the majority's determination that law enforcement's failure

---

not the sole responsibility of the Bernalillo Police Department and there is no evidence of some sort of conspiracy among officers or departments.

[8] Gutierrez seems to confuse legitimate police attention to criminal activity with harassment. His extensive criminal record suggests his repeated criminal acts, not general animus, were the source of police interest in him.

to preserve potentially useful evidence does not amount to a due process violation, unless the defendant can show that law enforcement acted in bad faith." 615 F.3d at 1299. But we declined to determine whether an exception to the bad faith requirement exists, stating:

> [R]eliance on Justice Stevens's concurrence [in *Youngblood*] is unavailing for two reasons. First, at the risk of stating the obvious, Justice Stevens was not speaking for a majority of the Court in *Youngblood*. Indeed, no other justice joined his concurrence. We have never applied Justice Stevens's view as controlling precedent. And we see no tenable basis for doing so here.
>
> Second, even if we could accept the proposition that law enforcement bad faith is not required in cases where the loss or destruction of evidence is so critical to the defense as to render the trial fundamentally unfair, we would have little difficulty concluding on the facts before us that this is not such a case.

*Id*. at 1300. At the hearing on Gutierrez's motion to dismiss, the district court noted:

> [Gutierrez] is still free to argue these claims to the jury, which in fact, in my view, provides him with an avenue that he might not have had if the evidence had been preserved.
>
> Similarly, the defendant's expert, if you have one, would still be able to provide testimony about how the firearm could have been expelled from the vehicle after the crash, even without knowing the exact speed and impact that may or may not have been shown by the vehicle's black box or sensors.

(R. Vol. 3 at 220-21.); *see Hood*, 615 F.3d at 1300 (holding Hood "had ample opportunity to advance his defense theory before the jury in other ways"). It is highly unlikely Gutierrez's defense would have been adversely affected by the absence of the

- 12 -

unpreserved evidence.

AFFIRMED.

Entered by the Court:

**Terrence L. O'Brien**
United States Circuit Judge