**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**May 4, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

OSCAR ORRANTIA,

    Defendant - Appellant.

No. 24-2132
(D.C. No. 2:22-CR-01360-MIS-DLM-1)
(D.N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **McHUGH,** Circuit Judges, and **VRATIL**, District Judge. [**]
_____

Oscar Orrantia, a Customs and Border Protection officer, was on duty at an inspection point in Southern New Mexico when he pulled a man out of his truck and threw him to the ground. He then wrote in his incident report that the man had threatened him and was not cooperative. But that information was false. So the government charged him with depriving the man of his rights and

_____

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

[**] The Honorable Kathryn H. Vratil, U.S. District Judge, United States District Court for the District of Kansas, sitting by designation.

falsifying records. *See generally* 18 U.S.C. §§ 242, 1519. A jury convicted Orrantia on both counts.

On appeal, Orrantia raises six alleged errors from his trial. We address only one of them because he has withdrawn or waived the other five. Orrantia's only live issue is whether the government violated Orrantia's due process rights under *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988), by deleting under its retention policy a video of a separate incident involving Orrantia.

We reject Orrantia's due process argument. He does not show that the government acted in bad faith by deleting the video. So the government didn't violate his due process rights. Thus, seeing no error, we exercise our jurisdiction under 28 U.S.C. § 1291 and affirm.

## BACKGROUND

### I.    Factual Background

On a hot June day in southern New Mexico in 2019, sixty-three-year-old Anastacio Granillo and his cousin's husband, Jose Nevarez, were returning home to Deming, New Mexico, after having a truck repaired in Mexico. They carried some allergy pills they had purchased in Palomas, Mexico.

Granillo and Nevarez returned to the United States through the Columbus Port of Entry (POE) in Columbus, New Mexico. Granillo was driving. The two waited in the truck for half an hour before reaching the inspection point. The truck's air conditioning had stopped working.

2

Orrantia was the CBP officer on duty. Orrantia greeted Granillo in Spanish: "Hello. What are you going to tell me?"[1] "That you have us roasting with the heat out there," Granillo said, handing Orrantia his passport. Orrantia responded, "Excuse me?" Granillo said, "It's very hot outside. Well, what can we do?" "Do not cross," Orrantia instructed.

Orrantia then asked Granillo whether he was bringing any items back from Mexico. "Pills," Granillo said, handing the allergy pills to Orrantia. Orrantia said, "Pills? Calm down, okay?" Granillo demurred, "No, no, well it's just that—People get upset because you have us out there with this heat."

Granillo then glanced at Orrantia's name tag, and Orrantia became angry. Switching to English, Orrantia asked, "Do you want to know my name?" Sticking with Spanish, Granillo confirmed that he only wanted to see Orrantia's name. "Are you threatening me?" Orrantia asked. Once again, Granillo demurred, "I want to see your name." So Orrantia asked again, "Are you threatening me?" Still in Spanish, Granillo repeated, "I want to see what your name is."

After more back and forth, Orrantia told Granillo to open the door and once again asked, "Are you threatening me?" Granillo assured Orrantia that he

---

[1] Orrantia and Granillo spoke Spanish for part of their interaction. We rely on the English translation read at trial. Neither party disputes the translation's accuracy.

was not. Orrantia opened the car door, then, a few moments later, demanded in Spanish: "You know what? Take off your belt; get off."

Granillo thought Orrantia was referring to his pants belt, though Orrantia probably meant to ask Granillo to remove his seat belt. So believing that he was instructed to take off his pants belt, Granillo began to undo it. But before giving Granillo time to comply, Orrantia grabbed him and tried to pull him out of the truck.

While grabbing Granillo, Orrantia said, "Get off." Apparently confused, Granillo said, "Well, you told me to take off . . . " "Get off," Orrantia interjected. ". . . [t]he belt," Granillo said, finishing his sentence. "Get off," Orrantia said again. Granillo said, "But don't—don't grab me like that, don't grab me like that."

Orrantia was not deterred. By this point, Granillo stood outside the truck as Orrantia held onto his arm and chest. "Turn around," Orrantia instructed, still in Spanish. Granillo responded, "Ah, tell me to turn around; don't—don't grab me like that, don't grab me like that." "Let's see," Orrantia said.

Orrantia turned Granillo around to face the cab. "Let's see what? What are you going to do to me or what?" Granillo asked. Orrantia said, "I'm going to knock you down; do you understand me?" Granillo responded, "All right. Just—oh, damn. Shit," as Orrantia knocked him to the ground. Orrantia told Granillo, "Get down. Get down on the floor. Get down on the floor, sir."

4

At this point, Granillo was bent over, and Orrantia stood over him, holding him. Granillo wanted time to comply, so he asked Orrantia several times to "wait." "Get down on the floor," Orrantia said again. "Damn, you just knocked me down," Granillo told him. "I'm getting down. Wait," he said again. Orrantia again pushed Granillo to the ground.

During the altercation, Granillo hit his head on a brick barrier. He was in "a lot of pain" and "was seeing little stars." App. vol. III at 446.

Granillo lay on the ground as Orrantia kneeled over him. Meanwhile, Victor Endlich, another CBP officer, came to assist. As Orrantia placed Granillo in handcuffs, Endlich asked Orrantia, "What do you got, bro?" Orrantia responded, "Naw, man, this guy was fucking being a dick. He started resisting when I told him to get off." Granillo chimed in, "But I didn't tell you that I didn't want to get off." A third officer approached, and Endlich said, "I don't know what happened." Endlich asked Orrantia, "Is it a hit, bro?"[2] "No," Orrantia said.

Leticia Ballesteros was the CBP supervisor on duty that day. When Orrantia came to her office soon after the incident, he told her that there had been an incident in which a subject had "become upset" at him, so "he had to take him out," and that the subject "had struck his head." *Id.* at 393.

---

[2] A "hit" is when a records search returns an alert that the traveler has an outstanding warrant, has a protection order issued against them, or is known to be armed and dangerous.

5

Ballesteros went to see Granillo. She immediately noticed that he had a large bump on his head, the skin was broken, and there was blood. So she called an ambulance.

Ballesteros then asked Orrantia to fill out an incident report, known as an IOIL. In it, he described the incident, but he misstated several important facts. For example, he reported that Granillo had continued to complain about how long he waited in line rather than answer Orrantia's questions. He stated that Granillo "threw/forced" the allergy pills into his hand. Supp. App. vol. I at 53. And he said that Granillo took an aggressive posture: "he pulled his shoulders back and stuck out his chest towards me. I asked the subject if he was threatening me. The subject stated that he just wanted my name. I clearly showed the subject my name tag. The subject continued to stick out his chest . . . ." *Id.* at 53.

Orrantia also characterized Granillo as uncooperative, stating twice that Granillo had refused to get out of his vehicle. He reported that Granillo pulled away and repeatedly tensed his muscles to prevent Orrantia from handcuffing him. And he stated that he "did not push" Granillo to the ground but "guide[d]" him to the ground when Granillo was off balance. *Id.* at 54.

## II.    Procedural History

On November 15, 2023, a grand jury charged Orrantia with two counts: (1) depriving Granillo of his Fourth Amendment rights while acting under color

of law, in violation of 18 U.S.C. § 242, and (2) knowingly making a false entry in a record, in violation of 18 U.S.C. § 1519.[3]

## A.     Proposed Rule 404(b) Evidence

Before trial, the government asked the district court for permission to introduce, under Federal Rule of Evidence 404(b), evidence of four other incidents involving Orrantia. *See generally* Fed. R. Evid. 404(b). The government argued that these incidents showed his "intent, knowledge, and absence of mistake or accident in this case." App. vol. I at 89.

The first incident, the "checkpoint incident," happened in 2018 when Orrantia was off duty. While traveling through a CBP checkpoint near Las Cruces, New Mexico, Orrantia was uncooperative and eventually flashed his CBP badge to avoid getting screened. The incident ended with another CBP officer drawing his handgun and with Orrantia in restraints. Upon Orrantia's return to Albuquerque, his supervisor confiscated his service weapon "as a precautionary measure." App. vol. I at 95.

---

[3] The original indictment charged only the deprivation-of-rights count. The first superseding indictment added a false-entry-of-records count and two theories in support of the deprivation-of-rights charge: unlawful force and unlawful detention or arrest. The second superseding indictment—the operative indictment—omitted the unlawful arrest or detention theory for the deprivation-of-rights charge.

The second incident, the "Montoya" incident,[4] occurred in August 2019 when Orrantia was manning the inspection booth at the Columbus POE. This incident involved Roberto Montoya, a fifty-year-old ambulance driver who lived in Columbus. He crossed the border to Mexico almost daily to visit his sick father in Palomas, Mexico. When Montoya was traveling through the Columbus POE one day in August 2019, Orrantia yelled at him to get out of his vehicle. In response, Montoya told Orrantia that he did not speak English. Orrantia opened Montoya's car door and pulled him from the vehicle, injuring Montoya's arm. Orrantia told Montoya to "shut up" but never explained why he had handcuffed him. Other CBP agents recognized Montoya and removed his handcuffs. Montoya later filed an official complaint against Orrantia.

Like the second incident, the third incident—the "girlfriend" incident—happened when Orrantia was on duty at the Columbus POE. In May 2020, Orrantia was working in a CBP rover vehicle with another CBP officer. Orrantia told her that he was expecting his girlfriend to visit him at work that day. But CBP officers are not allowed to have friends or significant others visit them while they're working. The other officer told Orrantia that, then left because she felt uncomfortable. When she returned, she saw Orrantia with his girlfriend inside the rover. Orrantia was later disciplined.

---

[4] The parties refer to this incident as the "W1" incident. We relabel it to help the unfamiliar reader.

The fourth incident, the "Barron" incident,[5] happened in June 2020, also at the Columbus POE. As they often did, Amanda Barron and her family were traveling back through the Columbus POE after visiting family in Palomas, Mexico. Though she told Orrantia that she was opening her car door to retrieve a dropped document, Orrantia accused her of "trying to smash his fingers and hit his face." *Id.* at 98. Orrantia then removed Barron from her car, turned her around, and twisted her left arm while handcuffing her, hurting her. Barron's husband was handcuffed, too. Barron was escorted inside and separated from her children. A CBP supervisor released Barron. She later filed a complaint against Orrantia.

In response to the government's motion to introduce these four incidents, Orrantia argued that none of the incidents fit into any of Rule 404(b)'s permitted purposes and, in any event, that the evidence's probative value was substantially outweighed by a danger of unfair prejudice. *See generally* Fed. R. Evid. 403, 404(b).

After a hearing, the district court partially granted the government's request. It permitted the government to introduce evidence of the Montoya and Barron incidents under Rules 403 and 404(b), reasoning that they both were relevant and showed Orrantia's motive and intent. But the court agreed to give the jury limiting instructions for both the Montoya and Barron incidents. The

---

[5] The parties refer to this incident as the "W2" incident. We relabel it to help the unfamiliar reader.

court deferred ruling on the government's request to admit the checkpoint incident, because it hadn't yet "heard the defendant's theory of the case" and it was "hard to rule on these things in a vacuum." App. vol. II at 168. To that end, it instructed the government to approach the bench before seeking to introduce the checkpoint incident at trial. Finally, the court denied the government's request to admit evidence of the girlfriend incident.

## B.    Suppression Motion

At the same hearing, the government told the district court that the Columbus POE's director had seen a video of the Barron incident, but that the video had been deleted under the agency's retention policy before the government filed its charges against Orrantia. Orrantia and his counsel then claimed not to have known before the hearing that a video had ever existed.

Orrantia moved to suppress the Montoya and Barron incidents based on spoliation. He argued that, by deleting the videos, the government had violated his due process rights under *Trombetta*, 467 U.S. 479, and *Youngblood*, 488 U.S. 51.

The district court denied Orrantia's request. It found no apparent exculpatory value in the videos. It also concluded that Orrantia had not shown that the government deleted the videos in bad faith, stating that "it appears the video evidence was deleted as part of [CBP]'s policy of routinely deleting videos after 90 days." App. vol. II at 155.

### C.    Trial

The evidentiary disputes continued at trial. On direct examination, Orrantia testified about the Montoya, Barron, and Granillo incidents. The government argued that Orrantia had "put his character for truthfulness at issue" by testifying. App. vol. V at 831. So, following the court's earlier direction, the government asked the court to permit it to introduce evidence of the checkpoint incident. After some discussion, the court ruled that Rule 608 permitted the government to "inquire into specific instances of conduct that are probative for truthfulness or untruthfulness." *Id.* at 833. Here, that included asking Orrantia about "his truthfulness when reporting the [checkpoint] incident—whether he was extracted from the car or not; whether he said he wasn't extracted, and it turned out, later, he said he was extracted." *Id.* The court also assured the government that it could "cross-exam[ine] [Orrantia] on anything that he talks about in direct." *Id.* at 834.

During his direct examination, Orrantia said that he did not "intentionally falsify anything" in his IOIL report on the Granillo incident. *Id.* at 876. Though we're unsure how it mattered, he testified that he had been "instructed to leave [his] feelings out of the memorandum." *Id.* Orrantia also testified that "[g]overnment officials" had accused him of not telling the truth at the checkpoint incident. *Id.* at 838.

From that, the government argued during a jury recess that Orrantia had opened the door to more questioning about the checkpoint incident. It argued

11

that Orrantia's "using his badge inappropriately on a prior incident goes directly toward the lack of mistake" for both charges, so it was admissible under Rule 404(b). *See id.* at 882. Orrantia objected under Rules 403 and 404(b), asserting that the evidence proves only "that he used his badge wrongly" and "doesn't prove that he knew he was doing something wrong when he pulled Mr. Granillo out." *Id.* at 883. After a discussion, the court permitted Orrantia to testify about whether he was disciplined for misusing his CBP badge during the checkpoint incident but barred the government from eliciting more details. The court permitted this evidence to impeach Orrantia's testimony that he was accused but not convicted of being dishonest, as well as under Rule 608 to examine his truthfulness.

Hearing this, the government also brought up another incident when Orrantia's employer had investigated him for lying: the girlfriend incident. The government proposed introducing the incident's disciplinary report and calling Columbus Port of Entry Director Tony Hall to further impeach Orrantia's testimony that he had "been accused of dishonesty but that it was not sustained." *Id.* at 896. Though excluding the written incident report, the court—both for impeachment and under Rule 608—permitted the government to call Director Hall and to ask him about his "report that Mr. Orrantia was dishonest" about this incident. *Id.* at 896. Director Hall testified that Orrantia had been dishonest about the girlfriend incident because he claimed to have had permission to have visitors, but he did not.

12

The jury convicted Orrantia on both counts. The court sentenced him to twenty months' imprisonment. Orrantia timely appealed.

## DISCUSSION

By our count, Orrantia makes six arguments on appeal. We consider just one of them because Orrantia has either waived or withdrawn the rest. We address, and reject, his suppression argument before turning to his other five arguments.

## I.    Suppression Issues

### A.    Standard of Review

We review for clear error "a district court's determination that the government did not destroy potentially exculpatory evidence." *United States v. Smith*, 534 F.3d 1211, 1223–24 (10th Cir. 2008). Likewise, we review for clear error a district court's ruling "on whether the evidence bore apparent exculpatory value." *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1228 (10th Cir. 2024).

### B.    Analysis

Orrantia argues that the government violated his due process rights by depriving him of exculpatory evidence when it destroyed a video of the Barron incident.[6] He claims that, without an opportunity to watch the video, he could

---

[6] Before oral argument, Orrantia moved for a partial remand so the district court could decide whether to admit an interview summary from Director Hall about his review of the Barron video. But Orrantia never

(*footnote continued*)

not fairly counter the government's evidence about the incident.[7] The government responds that Orrantia has not shown that the video had apparent exculpatory value and that, in any event, it deleted the videos not in bad faith, but rather under its 90-day retention policy.

When the government no longer possesses disputed evidence, *Trombetta* and *Youngblood* govern a defendant's due process claim. *Coones v. Bd. of Cnty. Comm'rs*, 166 F.4th 1, 17–18 (10th Cir. 2026). Under *Trombetta*, the government violates a defendant's due process rights when "(1) it loses or destroys evidence whose exculpatory significance is apparent before the loss or destruction; and (2) the defendant remains unable to obtain comparable evidence by other reasonably available means." *Id.* at 18 (citation modified); *accord Trombetta*, 467 U.S. at 489. But if the evidence's exculpatory value is "indeterminate" so that the evidence is only "potentially useful," then *Youngblood* controls, meaning the defendant must show that the government

---

adequately explains what the document is, what it says, or why it wasn't offered at trial. He also never explains how admitting this evidence would affect his appeal. So we deny his motion.

[7] In the district court, Orrantia moved to suppress all the Rule 404(b) evidence because the government had destroyed videos of *both* the Montoya and Barron incidents. Though the record does not show that the Montoya incident was recorded, the government agreed that it was "logical to assume" that a video had existed but had been deleted. App. vol. I at 142 n.1. On appeal, Orrantia argues about only the Barron incident video, but our reasoning applies equally to both incidents.

acted in bad faith in destroying the evidence. *Coones*, 166 F.4th at 18; *accord Youngblood*, 488 U.S. at 57–58.

The district court determined that the deleted videos lacked any apparent exculpatory value because they depicted the Montoya and Barron incidents, not the charged Granillo incident. The court also found that the government did not act in bad faith by deleting the videos under CBP policies that allow the deletion of videos after ninety days. Further, the video of the Barron incident had been deleted for about five months by the time the government opened its criminal investigation, showing that the government had not acted in bad faith.

We agree with the district court. To start, we conclude that *Youngblood*, not *Trombetta*, governs Orrantia's claims. *Trombetta* applies only when the evidence's exculpatory significance was "apparent before" destruction. 467 U.S. at 489; *see also United States v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994). Here, the Barron video's exculpatory value is not apparent at all. We do not know what the video shows. At best, it might help Orrantia attack or undermine the inferences the jury could draw from the Barron incident. But the district court admitted evidence of the Barron incident under Rule 404(b) to show only Orrantia's motive and intent for the Granillo incident. *See generally* Fed. R. Evid. 404(b)(2). And the Barron incident was not the only evidence of

15

Orrantia's motive and intent. So the exculpatory value for Orrantia's deprivation-of-rights charge is not apparent.

In fact, the Barron video's exculpatory value falls short of the exculpatory value of the evidence at issue in *Youngblood* itself. The evidence in that case "could have been subjected to tests, the results of which might have exonerated the defendant." 488 U.S. at 57. But the video here is "potentially useful evidence" only because Orrantia might have used it merely to attack a piece of the Rule 404(b) evidence, not the Granillo incident itself. *Id.* at 58. Thus, though the video "might conceivably have contributed to" Orrantia's defense, the "chances are extremely low" that it would have been exculpatory. *Trombetta*, 467 U.S. at 489.

So under *Youngblood*, Orrantia must show that the government acted in bad faith by destroying the Barron video. 488 U.S. at 58. This inquiry turns on the government's knowledge of the evidence's exculpatory value at the time it was lost or destroyed. *Bohl*, 25 F.3d at 911.

Orrantia argues that the government deleted the video even though it knew or should have known "that the videos of the subsequent incidents were important to [the government's] investigation and also as exculpatory evidence." Op. Br. at 38. But he never explains why. After all, according to the government, CBP did not begin to investigate Orrantia for the Granillo incident until February 18, 2021, more than a year after the incident. And the government did not consider prosecution until ten months after that. Orrantia

16

gives no reason to doubt the district court's finding that CBP deleted the videos in accordance with its retention policy. And we've held that "the government does not necessarily engage in bad faith conduct when the destruction of evidence results from a standard procedure employed by the governmental department or agency regarding the disposal of like evidence, at least when there is adequate documentation of the destroyed evidence." *Bohl*, 25 F.3d at 912–13. And Orrantia gives neither a reason why CBP should have kept this video despite its policies, nor a reason to think CBP needed to keep documentation of the destroyed video. Thus, we conclude that no due process violation occurred under *Trombetta* or *Youngblood*.

## II.    Orrantia's Other Arguments

Normally, we review decisions to admit or exclude evidence for abuse of discretion. *United States v. Harper*, 118 F.4th 1288, 1295 (10th Cir. 2024). But when an appellant fails to preserve an issue in district court and then fails to make a plain-error argument on appeal, we deem the issue waived. *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019).

In his briefs, Orrantia makes five other arguments. He withdrew one at oral argument and waived the other four. We briefly address each.

### A.    Mens Rea Argument

First, Orrantia waived his argument that the evidence was insufficient to show that he *knowingly* falsified records. *See generally* 18 U.S.C. § 1519. Orrantia never made that argument in the district court. There, he argued that

17

"nothing in the evidence so far has shown that he wrote anything false in that report." App. vol. IV at 686. Thus, his argument was that the information wasn't false, not that it wasn't *knowingly* false. *See id.* But "[w]hen a defendant challenges in district court the sufficiency of the evidence on specific grounds, all grounds not specified in the motion are waived." *United States v. Murphy*, 100 F.4th 1184, 1193 (10th Cir. 2024) (citation modified). Orrantia has also failed to argue plain error on appeal. And when "an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise." *Leffler*, 942 F.3d at 1196. So Orrantia waived this argument.

## B.    As-Applied Constitutionality

Second, Orrantia waived his argument that 18 U.S.C. § 1519 is unconstitutional as applied to him. He did not make this argument to the district court. Nor has he argued plain error on appeal. So Orrantia has waived this argument. *See Leffler*, 942 F.3d 1196 ("[W]hen a party raises a forfeited argument on appeal, we will reverse only if the appellant can satisfy our rigorous plain-error test.").

## C.    Jury Unanimity

Third, Orrantia argues in his reply brief that the district court erred by instructing the jury that it did not need to decide unanimously which statement

18

was false. But Orrantia withdrew this argument at oral argument so we don't consider it.

### D.    Rule 404(b) Evidence

Fourth, Orrantia argues that the district court abused its discretion by admitting evidence of the four "other bad acts" incidents under Rule 404(b) because, under Rule 403, the evidence was "more prejudicial tha[n] probative."[8] Op. Br. at 41; *see generally* Fed. R. Evid. 403. He argues that the probative value of the four incidents together was substantially outweighed by the danger of prejudice. The government counters that Orrantia waived his argument by not objecting on this basis at trial and by not arguing for plain-error review on appeal.

Orrantia waived this argument.

For one, Orrantia misstates the record. The district court did not admit evidence of the four prior incidents—the checkpoint incident, the girlfriend incident, and the Montoya and Barron incidents—under Rule 404(b). Though the government initially sought to admit all four under Rule 404(b), the district court admitted only the Montoya and Barron incidents and read a limiting instruction for each to the jury. Before trial, the court prohibited the

---

[8] Orrantia also argues that the district court allowed the government to use his encounter with Granillo as a fifth "bad act[]" incident under Rule 404(b). We see no record support for this. In fact, Orrantia later argues that only four events were admitted under Rule 404(b). So we consider only the four discussed at trial.

government from introducing evidence of the checkpoint incident or the girlfriend incident.

But as the trial developed, the district court permitted the government to admit limited evidence about the checkpoint incident, including that Orrantia had flashed his badge and had been reported to his superiors. As for the girlfriend incident, as the trial developed, the district court permitted the government to ask Director Hall about the girlfriend incident under Rule 608 and "as impeachment because [Orrantia testified on direct examination that] he had been investigated for dishonesty and that . . . he was not convicted of anything." App. vol. V at 1003. The court explained that Director Hall could impeach Orrantia's testimony by suggesting that it was not true that Orrantia had not been "convicted of dishonesty." App. vol. V at 1003.

Thus, Orrantia has waived this argument. Because the district court permitted only a few questions about the checkpoint and girlfriend incidents as impeachment and under Rule 608, the district court was never presented with an argument that all four incidents together violated Rule 403. During Hall's testimony, Orrantia raised only a hearsay objection. Simply put, the district court never considered the argument because the alleged errors Orrantia raises on appeal never happened.

Still, Orrantia contends that the district court did not "conduct a [Rule] 403 analysis" when it admitted the checkpoint and girlfriend incidents. Op. Br. at 41.

But that's wrong. The court did analyze the girlfriend and checkpoint incidents under Rule 403. Before closing arguments, Orrantia objected under Rule 403 to Director Hall's testimony about the checkpoint and girlfriend incidents, arguing "that, under [Rule] 403, that it outweighs [Rule] 608," which we take to mean that the danger of unfair prejudice outweighed any relevance the evidence had for Orrantia's character for truthfulness. App. vol. V at 1004. The court responded: "I find that the evidence concerning truthfulness and impeachment is relevant given the defendant testified and he made a statement that he had been investigated for dishonesty but was not 'convicted.'" *Id.* The court invoked Rule 403 and held that the evidence was "probative and that [its] probative value is not substantially outweighed by any unfair prejudice, especially since we're giving a limiting instruction, and that it won't . . . mislead the jury or confuse any of the issues." *Id.* at 1005. And on appeal, Orrantia does not argue that the court's Rule 403 ruling about Director Hall's testimony was incorrect.

Even if we were to construe Orrantia's argument on appeal to concern only the evidence the district court *did* admit under Rule 404(b)—rather than all evidence the government *tried* to introduce under Rule 404(b), some of which was eventually admitted under Rule 608 or to impeach Orrantia—his argument would fail. He does not explain how admitting limited testimony about the Montoya and Barron incidents created a risk of unfair prejudice, let alone how it substantially outweighed their probative value. After all, "all

21

evidence poses a risk of prejudicing the defendant; Rule 403 focuses only on *unfair* prejudice." *United States v. Johnson*, 157 F.4th 1309, 1320 (10th Cir. 2025). So because "[i]t is well-settled that arguments inadequately briefed in the opening brief are waived," Orrantia has waived this argument too. *United States v. Duque-Ramirez*, 161 F.4th 1237, 1252 (10th Cir. 2025) (citation omitted).

Ordinarily, we would consider under a plain-error standard Orrantia's argument that *all* the evidence the district court admitted to impeach Orrantia, under Rule 404(b) and under Rule 608, collectively violated Rule 403. But he never makes a plain-error argument. So Orrantia waived this argument, too. *See Leffler*, 942 F.3d at 1196.

### E.   Disciplinary Letter and Rule 608

Finally, Orrantia argues that the district court erred under Rule 608 by admitting into evidence a disciplinary letter from Director Hall to Orrantia. Rule 608 bars using extrinsic evidence to prove specific instances of a witness's conduct "to attack or support the witness's character for untruthfulness." *See* Fed. R. Evid. 608(b). In response, the government argues that Orrantia waived this argument by not objecting at trial and by not arguing for plain-error review on appeal.

Again, Orrantia's argument fails.

As before, he misstates the record. The district court did not admit the disciplinary letter into evidence.

22

That said, we understand Orrantia also to challenge the government's questioning Director Hall about the girlfriend incident, about which Director Hall had sent Orrantia the (unadmitted) disciplinary letter. The district court permitted the questioning both under Rule 608 and to impeach Orrantia. Orrantia contends that putting Director Hall on the stand to impeach him was "harmful" and violated Rule 608. *See* Op. Br. at 44–46.

But other than his earlier Rule 403 objection, Orrantia's only objection to Director Hall's testimony at trial was on hearsay grounds. He did not object that Rule 608 barred Director Hall's testimony. Quite the contrary. Orrantia stressed that his "objection is [Rule] 403; that, under 403, that it outweighs [Rule] 608." App. vol. V at 1004. And on appeal, he does not make a plain-error argument about Rule 608. Nor does he explain how the district court otherwise erred in admitting Director Hall's testimony to impeach him. Thus, he waived the argument, and we need not consider it further. *See Leffler*, 942 F.3d at 1196; *Duque-Ramirez*, 161 F.4th at 1252.

## CONCLUSION

We deny Orrantia's motion for a limited remand and affirm his conviction.

Entered for the Court

Gregory A. Phillips
Circuit Judge

23